T.C. Memo. 1999-188


UNITED STATES TAX COURT


MARK D. PRIDGEN AND KAY D. PRIDGEN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

DEWEY GASKINS AND FRANCINE P. GASKINS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 2048-97, 2075-97.  Filed June 9, 1999.


Trawick H. Stubbs, Jr. and J. Douglas McCullough, for
petitioners.

J. Craig Young, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WHALEN, Judge:  Respondent determined the following
deficiencies in, and penalties with respect to, the Federal
income tax of petitioners Mark and Kay Pridgen, in the case
at docket No. 2048-97:

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|---------------------|
| 1990 | $129,169 | $25,834 |
| 1991 | 232,416 | 46,483 |

Unless stated otherwise, all section references are to the Internal Revenue Code as in effect during the years in issue. Respondent also determined the following deficiencies in, addition to, and penalties with respect to the Federal income tax of petitioners Dewey and Francine Gaskins, in the case at docket No. 2075-97:

| Year | Deficiency | Penalty Sec. 6662(a) | Addition to Tax Sec. 6651(a)(1) |
|------|-----------|---------------------|-------------------------------|
| 1990 | $131,723 | $26,345 | -- |
| 1991 | 240,086 | 48,017 | $12,004 |

References in this opinion to "petitioners" are references to Mr. Pridgen and Mr. Gaskins. Petitioners and their wives resided in the State of North Carolina at the time the subject petitions were filed.

The above-captioned cases were consolidated for trial, briefing, and opinion by an order of the Court issued pursuant to Rule 141, Tax Court Rules of Practice and Procedure. In this opinion, all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the issues for decision are: (1) Whether a partnership, Beaufort Leaf Tobacco Co. (hereinafter referred to as Beaufort Leaf), in which each petitioner held an interest, failed to report tobacco sales of $888,528 in 1990 and $1,054,576 in 1991; (2) whether respondent erred in disallowing alleged tobacco purchases of $429,421 in 1990 and $1,173,203 in 1991 that were included in Beaufort Leaf's cost of goods sold; and (3) whether petitioners are liable for the penalties and addition to tax determined by respondent. The parties have stipulated that Mrs. Pridgen and Mrs. Gaskins are entitled to innocent spouse relief "under section 6013(e)". Thus, it appears that respondent concedes that Mrs. Pridgen and Mrs. Gaskins are eligible for relief from joint and several liability with respect to their joint returns for 1990 and 1991 under section 6015(a)(1), assuming that an appropriate election is made as required by section 6015(b)(1)(E).

The deficiencies determined in the notices of deficiency are based upon adjustments to each petitioner's distributive share of the net income of Beaufort Leaf for taxable years 1990 and 1991. Respondent adjusted Beaufort Leaf's net income without a proceeding at the partnership level. See generally section 6221 through 6233. It appears that all parties agree that Beaufort Leaf is a

small partnership, as defined under section 6231(a)(1)(B), and is exempt from the partnership audit and litigation procedures.

FINDINGS OF FACT

In 1987, petitioners and another individual who is now deceased, Mr. Harry Lee Roberts, formed Beaufort Leaf, a North Carolina general partnership, to engage in the purchase and sale of tobacco. The three partners agreed that petitioners would finance the partnership's operations and, for that purpose, that petitioners would cosign a note in the principal amount of $300,000. The partners also agreed that Mr. Roberts would be responsible for the day-to-day management and operation of the partnership and would be paid approximately $20,000 per year in addition to his share of any partnership income. There was no written partnership agreement, but the partners orally agreed that each partner would have a one-third distributive share of all partnership income, gain, loss, deduction, or credit. Petitioners initially intended that Beaufort Leaf would be in business for only 1 year, but it continued to conduct business until 1992.

During the time Beaufort Leaf was in business, Mr. William H. Dawson, Jr., a licensed accountant, maintained its books and prepared its Federal income tax

returns.  The partnership's returns for 1988, 1989, and 1990 respond to the question "which accounting method" by indicating that the partnership is on the "cash" method of accounting.  The partnership's return for 1991 indicates that the partnership is on the "accrual" method of accounting.  The final return of the partnership for 1992 does not respond to that question.

Beaufort Leaf's returns for 1988 through 1992 report the following items on Schedule K, Partner's Shares of Income, Credits, Deductions, Etc.:

|  | 1988 | 1989 | 1990 | 1991 | 1992 |
|---|---|---|---|---|---|
| Ordinary income from trade or business activities | $6,595.45 | $15,075.65 | $47,204.60 | $46,952.60 | $30.33 |
| Interest income | 2,471.80 | 6,734.72 | -0- | 3,286.00 | -0- |
| Guaranteed payments to partners | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 17,000.00 |
| Net long-term capital gain | 267.33 | -0- | -0- | -0- | -0- |
|  | 39,334.58 | 51,810.37 | 77,204.60 | 80,238.60 | 17,030.33 |

The above-guaranteed payments of $30,000 per year for 1988 through 1991 and $17,000 for 1992 were paid entirely to Mr. Roberts.  The record does not explain why Mr. Roberts was paid $30,000 per year after the partners had initially agreed that he would be paid $20,000 per year.

According to Beaufort Leaf's returns, the share of each of the partners in the net income of the partnership is as follows:

Net Income of Beaufort Leaf

| Year | Gaskins | Pridgen | Roberts | Total |
|------|---------|---------|---------|-------|
| 1988 | $3,111.53 | $3,111.53 | $3,111.51 | $9,334.57 |
| 1989 | 7,270.12 | 7,270.12 | 7,270.12 | 21,810.36 |
| 1990 | 15,734.87 | 15,734.87 | 15,734.86 | 47,204.60 |
| 1991 | 16,746.20 | 16,746.20 | 16,746.20 | 50,238.60 |
| 1991 | 10.11 | 10.11 | 10.11 | 30.33 |
| | 42,872.83 | 42,872.83 | 42,872.80 | 128,618.46 |

For 1991, the second of the 2 years in issue, the above net income, $50,238.60, is composed of ordinary income from trade or business activity of $46,952.60 and interest income of $3,286.

Beaufort Leaf's returns report the following withdrawals and distributions:

Withdrawals and Distributions

| Year | Gaskins | Pridgen | Roberts | Total |
|------|---------|---------|---------|-------|
| 1988 | $11,414.60 | $10,000.00 | $10,546.70 | $31,961.30 |
| 1989 | 3,111.53 | 3,111.53 | 2,500.00 | 8,723.06 |
| 1990 | 7,270.12 | 19,270.12 | 22,220.15 | 48,760.39 |
| 1991 | 32,481.07 | 20,481.07 | 16,746.20 | 69,708.34 |
| 1992 | -0- | -0- | -0- | -0- |
| | 54,277.32 | 52,862.72 | 52,013.05 | 159,153.09 |

Set out below is a summary of the income and deductions reported on Beaufort Leaf's income tax returns for the years in issue, 1990 and 1991:

|  | 1990 | 1991 |
|---|---|---|
| Gross receipts or sales | $1,264,701 | $2,849,451 |
| Cost of goods sold | 1,123,852 | 2,661,781 |
| Gross profit | 140,849 | 182,670 |

|  |  | 1990 |  | 1991 |
|---|---|---|---|---|
| Salaries and wages | $6,604 |  | $10,638 |  |
| Guaranteed payments to partners | 30,000 |  | 30,000 |  |
| Rent | 2,652 |  | 6,000 |  |
| Interest | 18,257 |  | 16,721 |  |
| Taxes | 1,132 |  | 1,629 |  |
| Repairs | 1,619 |  | 3,692 |  |
| Depreciation | 1,079 |  | 1,186 |  |
| Other deductions | 32,302 |  | 65,851 |  |
| Total deductions |  | 93,644 |  | 135,717 |
| Ordinary income (loss) |  | 47,205 |  | 46,953 |

Mr. Dawson, the partnership's accountant, computed the gross receipts of the partnership for Federal income tax purposes based on the aggregate deposits made to Beaufort Leaf's bank account, less certain deposits identified as repayments of loans or cash advances. Mr. Dawson computed Beaufort Leaf's cost of goods sold for 1990 and 1991 based on canceled checks and some accounting adjustments. His computation of the cost of goods for each year is as follows:

|  | 1990 | 1991 |
|---|---|---|
| Inventory at beginning of year | $199,602 | $132,914 |
| Purchases | 1,057,163 | 2,713,562 |
| Other costs (wholesale commissions) | -0- | 47,429 |
| Total | 1,256,765 | 2,893,905 |
| Inventory at end of year | 132,914 | 227,124 |
| Cost of goods sold | 1,123,851 | 2,666,781 |

Mr. Dawson kept a "journal" and "ledger" for Beaufort Leaf. He used bank statements, deposit slips, and checks from Beaufort Leaf's bank account to post entries to the journal. The record of these consolidated cases contains the journal for 1991. It does not include the journal for 1990 or the ledger for 1990 or 1991. The journal for 1991 shows that the sales and purchases reported for Federal income tax purposes on the partnership's 1991 return include the sales and purchases booked in the journal on a monthly basis, together with substantial yearend adjusting entries. Beaufort Leaf's journal for 1991 shows the following sales and purchases:

| Month | Sales | Purchases |
|-------|-------|-----------|
| 1/91 | $25,336.74 | $64,244.28 |
| 2/91 | 39,716.55 | 1,461.20 |
| 3/91 | -0- | 283.00 |
| 4/91 | 781.78 | 4,242.75 |
| 5/91 | -0- | 4,813.52 |
| 6/91 | -0- | 4,563.52 |
| 7/91 | 116,348.66 | -0- |
| 8/91 | 184,228.86 | 77,757.50 |
| 9/91 | 195,899.47 | 133,243.66 |
| 10/91 | 609,273.97 | 82,953.54 |
| 11/91 | 349,861.40 | 214,793.94 |
| 12/91 | 7,215.00 | 501,845.96 |
| | 1,528,662.43 | 1,090,202.87 |
| Adjusting entries | 1,320,788.88 | 1,273,359.59 |
| Adjusting entry | -0- | 350,000.00 |
| Totals per journal | 2,849,451.31 | 2,713,562.46 |

Beaufort Leaf's return for 1991 reports sales and purchases in the same amounts; i.e., $2,849,451.31 and $2,713,562.46, respectively.

Neither the journal for 1991 nor anything else in the record explains the nature of the "adjusting entries" shown in the journal increasing sales in the amount of $1,320,788.88 and increasing purchases in the amount of $1,273,359.59.  The adjusting entry to purchases of $350,000 is labeled "Accts Payable--OK Leaf" without any other explanation.

We note that Beaufort Leaf's journal for 1991 shows the following checks issued by the partnership to "HLRoberts" or "HLR":

| Date | Check No. | Amount |
|---|---|---|
| 1/05/91 | 663 | $946.00 |
| 2/26/91 | 681 | 1,500.00 |
| 3/18/91 | 690 | 1,000.00 |
| 3/21/91 | 693 | 2,600.00 |
| 4/05/91 | 702 | 1,500.00 |
| 4/05/91 | 705 | 300.00 |
| 4/10/91 | 707 | 200.00 |
| 4/15/91 | 708 | 1,200.00 |
| 4/16/91 | 709 | 5,000.00 |
| 4/19/91 | 712 | 2,000.00 |
| 4/19/91 | 713 | 500.00 |
| 4/19/91 | 714 | 1,777.96 |
| 4/26/91 | 720 | 7,500.00 |
| 5/01/91 | 727 | 1,000.00 |
| 5/03/91 | 734 | 1,054.43 |
| 5/03/91 | 735 | 1,000.00 |
| 5/13/91 | 742 | 1,000.00 |
| 5/23/91 | 744 | 500.00 |
| 5/29/91 | 749 | 599.77 |
| 5/29/91 | 750 | 500.00 |
| 6/07/91 | 762 | 500.00 |
| 6/07/91 | 764 | 2,200.00 |
| 6/17/91 | 768 | 1,375.00 |
| 6/17/91 | 769 | 1,200.00 |
| 6/25/91 | 772 | 300.00 |
| 7/02/91 | 775 | 500.00 |
| 7/16/91 | 783 | 1,200.00 |
| 7/18/91 | 786 | 900.00 |
| 7/24/91 | 797 | 300.00 |
| 8/01/91 | 808 | 500.00 |
| 8/07/91 | 818 | 3,500.00 |
| 8/07/91 | 820 | 1,200.00 |
| 8/16/91 | 833 | 500.00 |
| 8/29/91 | 850 | 1,500.00 |
| 8/29/91 | 851 | 150.00 |
| 9/19/91 | 874 | 1,500.00 |
| 9/25/91 | 878 | 5,835.00 |
| 10/03/91 | 887 | 5,000.00 |
| 10/14/91 | 904 | 4,580.00 |
| 10/18/91 | 907 | 2,520.00 |
| 10/24/91 | 917 | 1,120.00 |
| 10/25/91 | 920 | 1,500.00 |
| 10/31/91 | 921 | 13,500.00 |
| 11/07/91 | 934 | 1,500.00 |
| 11/18/91 | 938 | 1,000.00 |
| 11/20/91 | 940 | 2,000.00 |
| Total | | 87,558.16 |

The nature of the above payments is not described in the journal or elsewhere in the record of these cases.

As mentioned above, Beaufort Leaf was in the business of buying and selling tobacco. The marketing of tobacco is subject to Government regulation under the Agricultural Adjustment Act of 1938, ch. 30, secs. 311-314, 52 Stat. 45, current version at 7 U.S.C. secs. 1311-1316 (1994), which includes a record-keeping mechanism that is designed to account for all tobacco sales and purchases. See generally, Cole v. USDA, 33 F.3d 1263, 1265-1266 (11th Cir. 1994). As part of that record-keeping mechanism, dealers, like Beaufort Leaf, are required to maintain a Dealer's Record on Form MQ-79 issued by the U.S. Department of Agriculture. The Form MQ-79 is a comprehensive record of each purchase and resale of tobacco including the date, the amount of tobacco, the identity of the seller or purchaser, and a running balance of the amount of tobacco on hand after each transaction. In the case of purchases or resales at auction, the Form MQ-79 lists the warehouse at which the purchase or sale took place and requires a warehouse representative to sign the dealer's Form MQ-79.

Dealers are required to file their Dealer's Record with the Agriculture Stabilization and Conservation Service (ASCS) on a weekly basis. The amount of tobacco marketed is controlled by a quota system that establishes an allotment of tobacco for each tobacco-producing farm. See Cole

v. USDA, supra.  The marketing of tobacco in excess of a producer's allotment, so-called excess-quota tobacco, is subject to a penalty.  See id.

In the notices of deficiency issued to petitioners, respondent made two principal adjustments to Beaufort Leaf's returns for 1990 and 1991.  First, respondent increased the gross sales reported by the partnership.  The explanation of that adjustment in the subject notices of deficiency is as follows:

> It is determined that the partnership had additional income from tobacco sales for tax years 1990 and 1991 that was not reported on the returns.  It has been determined that tobacco sales totaled $2,153,228.00 in 1990 and $3,904,027.00 in 1991 instead of the amounts of $1,264,700.00 and $2,849,451.00 as shown on the returns.  Accordingly, the partnership net income is increased $888,528.00 in 1990 and $1,054,576.00 in 1991.  (See attached.)

The attachment referred to in the above explanation states that Beaufort Leaf's tobacco sales for 1990 were recomputed as follows:

| | |
|---|---:|
| (1) Sales of flue-cured tobacco | $1,225,535 |
| (2) Sales of burley tobacco | 853,015 |
| (3) Sales of tobacco "not in the form" | 74,678 |
| TOTAL TOBACCO SALES FOR 1990 | 2,153,228 |
| Claimed on return | 1,264,700 |
| Net adjustment to gross income | 888,528 |

The parties have stipulated that the Forms MQ-79 filed on behalf of Beaufort Leaf for 1990 report aggregate sales of flue-cured tobacco of $1,225,535, the amount used by respondent in computing the partnership's sales. Similarly, the parties have stipulated that the Forms MQ-79, filed on behalf of Beaufort Leaf for 1990, report aggregate sales of burley tobacco of $853,015, the amount used by respondent in recomputing the partnership's sales. Thus, the additional income from sales of flue-cured and burley tobacco computed by respondent for 1990 is based upon the sales reported in the Forms MQ-79 filed on behalf of Beaufort Leaf. Respondent determined the amount of unreported sales from so-called pickens tobacco on the basis of three receipts which state that Beaufort Leaf sold pickens tobacco to H.D. Pegram on June 5, 1990, in the aggregate amount of $74,678.

The attachment referred to in the explanation accompanying the notices of deficiency also states that the unreported tobacco sales of Beaufort Leaf for 1991 were recomputed on the basis of "checks written to Beaufort Leaf Tobacco Company from auction sales of tobacco but not deposited to the business account" in the aggregate amount of $1,054,576 and not included in the gross income reported by the partnership for 1991. The record of this case

contains a list of the undeposited checks showing the date of each auction sale, the name and location of the warehouse in which the sale took place, the amount of the check, and other information. Beaufort Leaf is listed as the dealer for each sale and was the payee of each undeposited check. All of the undeposited checks were endorsed by Mr. Roberts on behalf of Beaufort Leaf to other persons who endorsed the checks, so-called second endorsers. The following is a summary of the list of undeposited checks grouped according to the second endorsers:

| Second Endorser | Total Received |
|---|---|
| A.H. Pruit | $5,428 |
| Albert E. Vaughan | 16,442 |
| Bobby W. Griffin | 256,360 |
| Cash N/A Flash | 159,538 |
| Classic Pawn Shop | 45,444 |
| Coastal Tobacco | 19,758 |
| Day & Nite, Inc. | 235,590 |
| Estel D. Simmons | 72,232 |
| Greenville TV | 2,780 |
| Harold Simmons | 63,301 |
| James L. Vaughan | 151,134 |
| Martin Van Lee | 16,813 |
| Pawn & Shoppe, Inc. | 9,756 |
| Total unreported tobacco sales for 1991 | 1,054,576 |

The list of undeposited checks, described above, consists of 247 transactions. Of those transactions, 75 occurred at the Big Dixie Warehouse and 6 occurred at Bob Clark's Warehouse. These transactions are shown below:

| Date | Warehouse | Amount | Second Endorser |
|------|-----------|--------|-----------------|
| 09/11/91 | Big Dixie | $3,533.25 | Classic Pawn Shop |
| 09/17/91 | Big Dixie | 5,222.93 | Bobby W. Griffin |
| 10/10/91 | Big Dixie | 928.97 | Estel D. Simmons |
| 10/10/91 | Big Dixie | 251.07 | Estel D. Simmons |
| 10/10/91 | Big Dixie | 4,056.35 | Day & Nite, Inc. |
| 10/10/91 | Big Dixie | 7,680.98 | Day & Nite, Inc. |
| 10/10/91 | Big Dixie | 5,657.07 | Day & Nite, Inc. |
| 10/10/91 | Big Dixie | 5,553.79 | Day & Nite, Inc. |
| 10/10/91 | Big Dixie | 5,053.79 | Day & Nite, Inc. |
| 10/10/91 | Big Dixie | 3,475.33 | Estel D. Simmons |
| 10/10/91 | Big Dixie | 3,214.88 | Day & Nite, Inc. |
| 10/10/91 | Big Dixie | 2,856.89 | Day & Nite, Inc. |
| 10/10/91 | Big Dixie | 3,310.14 | Estel D. Simmons |
| 10/10/91 | Big Dixie | 4,340.97 | Day & Nite, Inc. |
| 10/10/91 | Big Dixie | 3,679.90 | Estel D. Simmons |
| 10/10/91 | Big Dixie | 6,311.83 | Estel D. Simmons |
| 10/10/91 | Big Dixie | 1,061.84 | Harold Simmons |
| 10/10/91 | Big Dixie | 4,664.55 | Harold Simmons |
| 10/10/91 | Big Dixie | 2,209.76 | Harold Simmons |
| 10/14/91 | Big Dixie | 1,794.68 | Cash N/A Flash |
| 10/14/91 | Big Dixie | 1,671.69 | Cash N/A Flash |
| 10/14/91 | Big Dixie | 2,779.71 | Greenville TV |
| 10/16/91 | Big Dixie | 5,250.06 | Cash N/A Flash |
| 10/16/91 | Big Dixie | 6,109.56 | Cash N/A Flash |
| 10/16/91 | Big Dixie | 2,481.27 | Cash N/A Flash |
| 10/16/91 | Big Dixie | 6,437.98 | Cash N/A Flash |
| 10/16/91 | Big Dixie | 4,895.64 | Cash N/A Flash |
| 10/16/91 | Big Dixie | 2,606.77 | Day & Nite, Inc. |
| 10/16/91 | Big Dixie | 2,296.31 | Cash N/A Flash |
| 10/16/91 | Big Dixie | 6,400.79 | Cash N/A Flash |
| 10/17/91 | Big Dixie | 3,708.50 | Cash N/A Flash |
| 10/17/91 | Big Dixie | 5,677.61 | Cash N/A Flash |
| 10/17/91 | Big Dixie | 6,568.49 | Cash N/A Flash |
| 10/17/91 | Big Dixie | 5,947.32 | Cash N/A Flash |
| 10/17/91 | Big Dixie | 5,281.77 | Cash N/A Flash |
| 10/17/91 | Big Dixie | 5,495.07 | Cash N/A Flash |
| 10/17/91 | Big Dixie | 4,974.55 | Cash N/A Flash |
| 10/17/91 | Big Dixie | 5,062.22 | Cash N/A Flash |
| 10/17/91 | Big Dixie | 5,166.51 | Cash N/A Flash |
| 10/17/91 | Big Dixie | 5,428.28 | A.H. Pruit |
| 10/17/91 | Big Dixie | 7,189.61 | Day & Nite, Inc. |
| 10/17/91 | Big Dixie | 216.78 | Day & Nite, Inc. |
| 10/21/91 | Big Dixie | 6,723.67 | Cash N/A Flash |
| 10/21/91 | Big Dixie | 3,079.56 | Cash N/A Flash |
| 10/21/91 | Big Dixie | 1,081.65 | Cash N/A Flash |
| 10/21/91 | Big Dixie | 1,943.41 | Cash N/A Flash |
| 10/21/91 | Big Dixie | 2,959.36 | Cash N/A Flash |
| 10/21/91 | Big Dixie | 4,231.81 | Cash N/A Flash |
| 10/21/91 | Big Dixie | 3,495.18 | Cash N/A Flash |
| 10/21/91 | Big Dixie | 5,101.46 | Cash N/A Flash |
| 10/21/91 | Big Dixie | 5,910.94 | Cash N/A Flash |
| 10/21/91 | Big Dixie | 6,367.52 | Cash N/A Flash |
| 10/21/91 | Big Dixie | 301.81 | Cash N/A Flash |
| 10/21/91 | Big Dixie | 6,549.17 | Cash N/A Flash |
| 10/21/91 | Big Dixie | 7,190.33 | Cash N/A Flash |

| | | | |
|---|---|---|---|
| 10/21/91 | Big Dixie | 6,726.40 | Cash N/A Flash |
| 10/21/91 | Big Dixie | 6,725.89 | Cash N/A Flash |
| 10/22/91 | Big Dixie | 1,119.27 | Harold Simmons |
| 10/22/91 | Big Dixie | 6,531.59 | Estel D. Simmons |
| 10/22/91 | Big Dixie | 2,651.59 | Estel D. Simmons |
| 10/22/91 | Big Dixie | 3,319.38 | Estel D. Simmons |
| 10/22/91 | Big Dixie | 4,698.06 | Estel D. Simmons |
| 10/22/91 | Big Dixie | 4,858.18 | Estel D. Simmons |
| 10/22/91 | Big Dixie | 4,258.52 | Harold Simmons |
| 10/22/91 | Big Dixie | 6,601.78 | Estel D. Simmons |
| 10/22/91 | Big Dixie | 4,113.32 | Harold Simmons |
| 10/22/91 | Big Dixie | 3,000.10 | Pawn & Shoppe |
| 10/22/91 | Big Dixie | 5,605.59 | Harold Simmons |
| 10/22/91 | Big Dixie | 4,561.06 | Harold Simmons |
| 10/22/91 | Big Dixie | 4,530.43 | Harold Simmons |
| 10/22/91 | Big Dixie | 998.80 | Harold Simmons |
| 10/23/91 | Big Dixie | 927.19 | Pawn & Shoppe |
| 10/23/91 | Big Dixie | 4,132.13 | Harold Simmons |
| 10/23/91 | Big Dixie | 802.81 | Estel D. Simmons |
| 10/23/91 | Big Dixie | 5,828.91 | Pawn & Shoppe |

$313,432.33

| Date | Warehouse | Amount | Second Endorser |
|---|---|---|---|
| 10/07/91 | Bob Clark's | $7,155.31 | Harold Simmons |
| 10/07/91 | Bob Clark's | 3,673.92 | Estel D. Simmons |
| 10/07/91 | Bob Clark's | 6,926.55 | Estel D. Simmons |
| 10/07/91 | Bob Clark's | 7,286.44 | Estel D. Simmons |
| 10/07/91 | Bob Clark's | 6,980.13 | Harold Simmons |
| 10/21/91 | Bob Clark's | 2,439.72 | Cash N/A Flash |

$34,462.07

Mr. Gaskins purchased the Big Dixie Warehouse in 1990. Set out below is a summary of the transactions reported on the Forms MQ-79 filed on behalf of Beaufort Leaf for 1990 and 1991 that took place at the Big Dixie Warehouse:

|        | Purchases | | Resales | | |
| Date   | Pounds | Dollars | Pounds | Dollars | Executed By |
|--------|--------|---------|--------|---------|-------------|
| 9/12/90  | -- | -0- | 4,017  | $7,017 | Linda Mercer |
| 9/18/90  | -- | -0- | 3,772  | 6,619  | Linda Mercer |
| 9/24/90  | -- | -0- | 11,145 | 17,063 | Mary D. Lancaster |
| 9/25/90  | -- | -0- | 7,866  | 13,841 | Mary D. Lancaster |
| 9/26/90  | -- | -0- | 10,465 | 18,105 | Mary D. Lancaster |
| 9/27/90  | -- | -0- | 2,811  | 5,005  | Mary D. Lancaster |
| 10/01/90 | -- | -0- | 9,721  | 17,374 | Mary D. Lancaster |
| 10/02/90 | -- | -0- | 11,033 | 19,509 | Mary D. Lancaster |
| 10/03/90 | -- | -0- | 5,881  | 10,138 | Mary D. Lancaster |
| 10/04/90 | -- | -0- | 7,723  | 13,284 | Mary D. Lancaster |
| 10/09/90 | -- | -0- | 11,006 | 19,368 | Mary D. Lancaster |
| 10/09/90 | -- | -0- | 18,037 | 22,210 | Dewey Gaskins |
| 10/10/90 | -- | -0- | 5,287  | 8,961  | Mary D. Lancaster |
| 10/15/90 | -- | -0- | 15,412 | 26,632 | Mary D. Lancaster |
| 10/16/90 | -- | -0- | 16,730 | 28,080 | Mary D. Lancaster |
| 10/17/90 | -- | -0- | 1,529  | 2,373  | Mary D. Lancaster |
| 10/18/90 | -- | -0- | 6,167  | 9,606  | Mary D. Lancaster |
| 10/22/90 | -- | -0- | 7,149  | 12,137 | Mary D. Lancaster |
| 10/23/90 | -- | -0- | 19,525 | 29,897 | Mary D. Lancaster |
| 10/24/90 | -- | -0- | 7,896  | 12,532 | Mary D. Lancaster |
| 10/25/90 | -- | -0- | 8,294  | 12,804 | Mary D. Lancaster |
| 10/29/90 | -- | -0- | 19,184 | 28,528 | (No Signature) |
| 10/30/90 | -- | -0- | 11,500 | 17,730 | (No Signature) |
| 10/31/90 | 6,784 | $6,784 | -- | -0- | Dewey Gaskins |
| 8/01/91  | -- | -0- | 6,784  | 6,784  | Dewey Gaskins |
| 8/01/91  | -- | -0- | 27,421 | 31,534 | Dewey Gaskins |
| 9/11/91  | -- | -0- | 3,447  | 6,157  | Dewey Gaskins |
| 9/17/91  | -- | -0- | 4,588  | 8,402  | Dewey Gaskins |
| 9/19/91  | -- | -0- | 4,517  | 8,176  | Dewey Gaskins |
| 10/10/91 | -- | -0- | 40,477 | 72,727 | Dewey Gaskins |
| 10/15/91 | -- | -0- | 39,632 | 69,381 | Mary D. Lancaster |
| 10/16/91 | -- | -0- | 38,125 | 66,787 | Mary D. Lancaster |
| 10/17/91 | -- | -0- | 39,421 | 69,278 | Mary D. Lancaster |
| 10/21/91 | -- | -0- | 40,135 | 70,572 | Dewey Gaskins |
| 10/22/91 | -- | -0- | 39,694 | 67,379 | Dewey Gaskins |
| 10/23/91 | -- | -0- | 28,387 | 47,586 | Dewey Gaskins |
|          | 6,784 | 6,784 | 534,778 | 883,576 | |

As shown above, in 1990 and 1991, Mr. Dewey Gaskins, acting on behalf of Big Dixie Warehouse, executed 11 of the Forms MQ-79 filed on behalf of Beaufort Leaf to document transactions at the Big Dixie Warehouse.

Mr. Gaskins also had a relationship with the Big Burley Warehouse, but the record does not state the precise

nature of that relationship.  The Forms MQ-79 filed on behalf of Beaufort Leaf report the following transactions at the Big Burley Warehouse:

|  | Resales | | |
| Date | Pounds | Dollars | Executed By |
| 1/08/90 | 5,922 | $9,890 | Jennie E. Tingle |
| 1/09/90 | 14,910 | 24,900 | Jennie E. Tingle |
| 1/10/90 | 11,168 | 18,710 | Dewey Gaskins |
| 1/11/90 | 6,504 | 10,907 | Dewey Gaskins |
| 1/16/90 | 20,211 | 33,788 | Jennie E. Tingle |
| 1/17/90 | 290 | 484 | Jennie E. Tingle |
| 1/22/90 | 3,702 | 6,193 | Dewey Gaskins |
| 1/23/90 | 4,218 | 7,044 | Dewey Gaskins |
| 1/24/90 | 602 | 1,014 | Dewey Gaskins |
| 1/25/90 | 4,550 | 7,652 | Dewey Gaskins |
| 1/29/90 | 7,306 | 12,263 | Dewey Gaskins |
| 1/30/90 | 6,212 | 10,418 | Dewey Gaskins |
| 12/06/90 | 40,136 | 70,490 | Dewey Gaskins |
| 12/12/90 | 40,265 | 70,308 | Jennie E. Tingle |
| 12/13/90 | 440 | 770 | (No Signature) |
| 1/30/91 | 12,030 | 21,293 | Dewey Gaskins |
|  | 178,466 | 306,124 | |

As shown above, Mr. Gaskins, acting on behalf of Big Burley Warehouse, executed 10 of the Forms MQ-79 filed by Beaufort Leaf during 1990 and 1991 to document transactions at the Big Burley Warehouse.

It appears that during 1990 and 1991, Mr. Mark Pridgen had a relationship with Bob Clark's Warehouse, but the record does not describe the precise nature of that relationship.  The Forms MQ-79 filed on behalf of Beaufort Leaf for 1990 and 1991 report the following transactions at Bob Clark's Warehouse:

|  | Purchases | | Resales | | |
| Date | Pounds | Dollars | Pounds | Dollars | Executed By |
|------|--------|---------|--------|---------|-------------|
| 7/30/90 | 42,362 | $61,425 | -- | -0- | Mark Pridgen |
| 7/31/90 | -- | -0- | 4,474 | $6,899 | Mark Pridgen |
| 8/02/90 | -- | -0- | 14,515 | 22,217 | Mark Pridgen |
| 8/03/90 | 12,325 | 17,748 | -- | -0- | Mark Pridgen |
| 8/22/90 | -- | -0- | 7,713 | 11,630 | Louise W. Broome |
| 8/27/90 | -- | -0- | 2,649 | 4,550 | Louise W. Broome |
| 8/28/90 | -- | -0- | 5,608 | 9,594 | Louise W. Broome |
| 8/29/90 | -- | -0- | 1,998 | 3,304 | Louise W. Broome |
| 8/30/90 | -- | -0- | 3,314 | 5,704 | Louise W. Broome |
| 9/06/90 | -- | -0- | 7,679 | 13,100 | Louise W. Broome |
| 9/10/90 | -- | -0- | 2,042 | 3,257 | Louise W. Broome |
| 9/18/90 | -- | -0- | 6,279 | 11,009 | Louise W. Broome |
| 9/25/90 | -- | -0- | 6,271 | 10,945 | Louise W. Broome |
| 10/04/90 | -- | -0- | 25,297 | 37,440 | Mark Pridgen |
| 10/24/90 | -- | -0- | 2,836 | 3,511 | Mark D. Pridgen |
| 10/29/90 | -- | -0- | 5,717 | 6,509 | Mark D. Pridgen |
| 7/15/91 | -- | -0- | 63,025 | 75,630 | Louise W. Broome |
| 9/02/91 | 63,182 | 91,614 | -- | -0- | Louise W. Broome |
| 9/24/91 | -- | -0- | 63,498 | 88,262 | Mark Pridgen |
| 10/07/91 | -- | -0- | 18,146 | 33,034 | Louise W. Broome |
| 10/09/91 | -- | -0- | 2,973 | 4,402 | Louise W. Broome |
| 10/21/91 | -- | -0- | 1,650 | 2,521 | Louise W. Broome |
|  | 117,869 | 170,787 | 245,684 | 353,519 | |

As shown above, during 1990 and 1991, Mr. Mark Pridgen, acting on behalf of Bob Clark's Warehouse, executed eight of the Forms MQ-79 filed on behalf of Beaufort Leaf to document transactions at Bob Clark's Warehouse.

It is not evident from the record of this case whether any of the 247 transactions set out on the list of undeposited checks, including the 81 transactions at the Big Dixie Warehouse and Bob Clark's Warehouse, were reported in any of the Forms MQ-79 filed on behalf of Beaufort Leaf.

The second adjustment to Beaufort Leaf's 1990 and 1991 returns that was made by respondent in the subject notices of deficiency is the disallowance of certain purchases included as cost of goods. The explanation of that adjustment in the notices of deficiency is as follows:

> The amount of $1,057,163.00 and $2,173,562.00 [sic] shown on your respective 1990 and 1991 tax returns as tobacco purchases is reduced by $429,421.00 and $1,173,203.00 because it has not been established that any amount more than $627,742.00 and $1,000,359.00 was for an ordinary and necessary business expense, or was expended for the purpose designated. Therefore, the partnership income is increased $429,421.00 in 1990 and $1,173,203.00 in 1991.

We note that Beaufort Leaf's 1991 return includes purchases of $2,713,562.46 in computing cost of goods sold, rather than "$2,173,562.00", as stated in the notices of deficiency. Set out below is a list of the date, check number, payee, and amount of each check disallowed by respondent:

1990 Disallowed Purchases

| Date | Check No. | Payee | Amount |
|------|-----------|-------|--------|
| 1/17/90 | 2777 | Blue Ridge Tobacco | $9,500.00 |
| 1/17/90 | 2778 | Blue Ridge Tobacco | 9,500.00 |
| 1/21/90 | 2782 | Blue Ridge Tobacco | 9,500.00 |
| 1/21/90 | 2783 | Blue Ridge Tobacco | 9,500.00 |
| 1/21/90 | 2785 | Blue Ridge Tobacco | 9,500.00 |
| 1/21/90 | 2786 | Blue Ridge Tobacco | 9,500.00 |
| 1/21/90 | 2787 | Blue Ridge Tobacco | 9,500.00 |
| 1/21/90 | 2788 | Blue Ridge Tobacco | 7,717.70 |
| 1/31/90 | 2797 | Blue Ridge Tobacco | 7,000.00 |
| 1/31/90 | 2798 | Blue Ridge Tobacco | 7,012.14 |
| 1/31/90 | 2799 | Blue Ridge Tobacco | 5,100.00 |
| 1/31/90 | 2800 | Blue Ridge Tobacco | 4,710.92 |
| 2/28/90 | 2810 | James V. Wells | 8,000.00 |
| 2/28/90 | 2811 | Blue Ridge Tobacco | 8,000.00 |
| 2/28/90 | 2812 | Blue Ridge Tobacco | 8,000.00 |
| 2/28/90 | 2813 | Blue Ridge Tobacco | 7,908.00 |
| 6/29/90 | 2844 | Blue Ridge Tobacco | 93,000.00 |
| 9/24/90 | 545 | Blue Ridge Tobacco | 1,700.00 |
| 11/22/90 | 586 | Blue Ridge Tobacco | 8,000.00 |
| 11/22/90 | 587 | Blue Ridge Tobacco | 2,021.25 |
| 12/19/90 | 643 | James Vaughn | 9,000.00 |
| 12/19/90 | 644 | Albert Vaughn | 9,000.00 |
| 10/03/90 | 553 | Coastal Tobacco | 7,000.00 |
| 10/04/90 | 554 | Coastal Tobacco | 8,000.00 |
| 10/05/90 | 555 | Coastal Tobacco | 9,500.00 |
| 10/05/90 | 558 | Coastal Tobacco | 8,746.72 |
| 10/09/90 | 566 | Coastal Tobacco | 9,000.00 |
| 10/10/90 | 567 | Coastal Tobacco | 8,000.00 |
| 10/17/90 | 577 | Coastal Tobacco | 9,000.00 |
| 10/17/90 | 578 | Coastal Tobacco | 9,000.00 |
| 10/17/90 | 579 | Coastal Tobacco | 9,000.00 |
| 10/25/90 | 591 | Coastal Tobacco | 9,500.00 |
| 12/04/90 | 635 | Graham Day | 54,004.08 |
| 12/14/90 | 640 | Tammy Short | 9,000.00 |
| 12/14/90 | 639 | Dennis Hawley | 9,000.00 |
| 12/21/90 | 646 | Dennis Hawley | 9,000.00 |
| 12/26/90 | 652 | Dennis Hawley | 9,000.00 |

429,420.81

1991 Disallowed Purchases

| Date | Check No. | Payee | Amount |
|------|-----------|-------|--------|
| 8/22/92 | 836 | Coastal Tobacco | $9,800 |
| 8/22/91 | 837 | Coastal Tobacco | 9,800 |
| 8/23/91 | 838 | Coastal Tobacco | 3,700 |
| 8/28/91 | 847 | Coastal Tobacco | 9,800 |
| 8/03/91 | 854 | Cash | 9,000 |
| 8/03/91 | 855 | Cash | 9,000 |
| 9/03/91 | 856 | Coastal Tobacco | 571 |
| 9/30/91 | 881 | Martin Lee | 9,500 |
| 10/01/91 | 882 | Martin Lee | 9,500 |
| 10/01/91 | 883 | Martin Lee | 4,991 |
| 10/09/91 | 897 | Martin Lee | 9,800 |
| 10/09/91 | 898 | Martin Lee | 9,800 |
| 10/10/91 | 899 | Martin Lee | 8,000 |
| 10/18/91 | 910 | Martin Lee | 9,800 |
| 10/18/91 | 911 | Martin Lee | 9,800 |
| 10/18/91 | 912 | Martin Lee | 9,800 |
| 10/18/91 | 913 | Martin Lee | 5,541 |
| 11/20/91 | 939 | Okay Leaf | 200,000 |
| 12/19/91 | 953 | Okay Leaf | 200,000 |
| 12/31/91 | 963 | Okay Leaf | 150,000 |
| 12/12/91 | 954 | Coastal Tobacco | 35,000 |
| 12/31/91 | 962 | C.L. Gurganus Whse | 100,000 |
| | | | 823,203 |
| Accounts payable--"OK Leaf" | | | 350,000 |
| | | | 1,173,203 |

On his income tax returns for 1990 and 1991, each petitioner included one-third of the net income reported by Beaufort Leaf. Mr. Pridgen's returns were prepared by the certified public accounting firm of Anthony & Tabb or its predecessor. Mr. Gaskins' returns were prepared by a certified public accountant, Mr. Frank Harper.

The two adjustments that respondent made to Beaufort Leaf's 1990 and 1991 returns, described above, increased the partnership's income and increased each partner's

one-third distributive share of the partnership's income

by the following amounts:

|  | 1990 | 1991 |
|---|---|---|
| Amount reported | $47,205 | $46,953 |
| Unreported gross receipts | 888,528 | 1,054,576 |
| Disallowed purchases | 429,421 | 1,173,203 |
| Adjusted income | 1,364,154 | 2,274,732 |
| One-third share | 455,051 | 758,244 |
| Less: amounts reported | 15,735 | 15,651 |
| Increase in partner's share | 439,316 | 742,593 |

Based on the adjustments to the partnership's income,

respondent issued a notice of deficiency to each petitioner

adjusting his individual income as follows:

| Mr. Pridgen | 1990 | 1991 |
|---|---|---|
| Share of partnership income | $439,316 | $741,498 |
| Self-employment tax deduction | (461) | (1,027) |
| Deduction for exemptions |  | 4,300 |
| Total adjustments | 438,855 | 744,771 |
| Reported income | 56,863 | 64,890 |
| Adjusted income | 495,718 | 809,661 |

| Mr. Gaskins | 1990 | 1991 |
|---|---|---|
| Share of partnership income | $439,316 | $742,593 |
| Self-employment tax deduction | (1,635) | (4,971) |
| Deduction for exemptions |  | 8,600 |
| Total adjustments | 437,681 | 746,222 |
| Reported income | 27,753 | 42,626 |
| Adjusted income | 465,434 | 788,848 |

OPINION

Unreported Sales

The first issue for decision is whether unreported income in the amount of $888,528 in 1990 and $1,054,576 in 1991 should be included in Beaufort Leaf's gross receipts, as determined by respondent. If Beaufort Leaf's gross receipts are increased as determined by respondent, then a one-third distributive share of the additional partnership income attributable to this adjustment is includable in the income of each petitioner. See sec. 702(a); United States v. Basye, 410 U.S. 441, 453-454 (1973).

Petitioners advance two arguments in support of their position that respondent erred by increasing Beaufort Leaf's gross receipts. First, they argue that the sales that are the source of the unreported income were outside the scope of the business of Beaufort Leaf. Accordingly, petitioners argue that the unreported income is the income of Mr. Roberts, not the income of Beaufort Leaf, and there

is no basis to assess tax on the unreported income against petitioners as partners of Beaufort Leaf.  In support of this argument, petitioners assert that the unreported income was derived from "illegal sales of nonexistent or over-quota tobacco * * * contrary to Federal law" and were made by Mr. Roberts without the knowledge, consent, or ratification of petitioners.

According to petitioners, under North Carolina partnership law, activities are outside the scope of the partnership unless expressly authorized by the partnership agreement or the other partners.  See, e.g., Shelton v. Fairley, 356 S.E.2d 917 (N.C. Ct. App. 1987); Investors Title Ins. Co. v. Herzig, 350 S.E.2d 160 (N.C. Ct. App. 1986), revd. on other grounds 360 S.E.2d 786 (N.C. 1987); see also Reed Coal Co. v. Fain, 89 S.E. 29 (N.C. 1916). Petitioners assert that Beaufort Leaf's oral partnership agreement did not authorize Mr. Roberts to engage in such illegal activities.  Thus, petitioners argue that the income realized is not includable in Beaufort Leaf's gross receipts.

In further support of this argument, petitioners assert that neither Beaufort Leaf nor petitioners knew of or received any economic benefit from Mr. Roberts' illegal sales of tobacco, and, therefore, only Mr. Roberts is

subject to tax on the income from such sales.  Petitioners rely on Commissioner v. Smith, 285 F.2d 91 (5th Cir. 1960), affg. Griffin v. Commissioner, T.C. Memo. 1958-210.  The taxpayer in that case had received "over-ceiling payments" from the purchasers of bottled whiskies.  See id. at 92. The whiskies were owned by partnerships of which the taxpayer was a partner.  See id.  The Court of Appeals affirmed the finding of this Court that the "overceiling payments" were income to the taxpayer and not to the partnerships.  See id. at 98.  Petitioners argue that the Court of Appeals "ruled that there was no evidence suggesting that the partnership agreement in question 'comprehended' illegal transactions or 'entitled' the other partners 'to part of the illegal payments * * *'". (Petitioners' brief quoting from Commissioner v. Smith, 285 F.2d, supra at 97.)

Second, petitioners argue that, even if the Court finds that the unreported income was partnership income, it was derived by Mr. Roberts from illegal activities, involving the "sale of excess or non-existent quota tobacco", and respondent has failed "to establish any foundation linking petitioners with the underlying illegal activity."  Petitioners cite Williams v. Commissioner, 999 F.2d 760, 764 (4th Cir. 1993), affg. T.C. Memo. 1992-153;

Portillo v. Commissioner, 932 F.2d 1128 (5th Cir. 1991), affg. in part and revg. in part T.C. Memo. 1990-68; Petzoldt v. Commissioner, 92 T.C. 661 (1989); and Tokarski v. Commissioner, 87 T.C. 74 (1986). Petitioners acknowledge that there is evidence linking the unreported income to Beaufort Leaf, such as the fact that each of the undeposited checks for 1991 was made payable to Beaufort Leaf. Nevertheless, petitioners argue that such evidence is not sufficient to satisfy respondent's burden of proof under the cases cited above. According to petitioners, respondent must introduce "significantly more compelling evidence, such as proof that the Petitioners received the proceeds of Robert's [sic] over-quota transactions."

At the outset, we note that there is evidence that, during the years in issue, Mr. Roberts joined a group of persons headed by Mr. James V. Wells to engage in a fraudulent scheme to acquire and sell excess-quota tobacco. In paragraph 5(d) of both petitions, petitioners describe the scheme as a widespread scheme, involving Mr. Roberts and "numerous other bogus dealers and/or legitimate dealers". Paragraph 5(d) of the subject petitions states as follows:

>    In 1990 and 1991, the managing partner
> entered into an illegal scheme to fraudulently

use Dealer Books, MQ-79, of the Company for his own personal gain.  Roberts became involved with numerous other bogus dealers and/or legitimate dealers to defraud the U.S. Department of Agriculture by selling excess quota or nonexistent quota.  The bogus dealers and/or legitimate dealers conspired to create nonexistent quota by entering false purchases on the bogus dealer's MQ-79 dealer books.  The participants then secured tobacco inventory directly from farmers who had produced excess farm quota.  These were cash transactions.  With the actual receipt of new tobacco and a MQ-79 dealer book reflecting legitimate purchases the various bogus and legitimate dealers were able to sell excess quota and profit there from [sic].

Respondent admitted that Mr. Roberts engaged in the above "illegal scheme" but denied that he did so "for his own personal gain."

In order to describe the scheme further, petitioner introduced into evidence the report of an agent of the Internal Revenue Service who audited Mr. Wells' returns for 1988 through 1991.  That report describes the scheme as follows:

Wells is believed to be a key figure in a fraudulent scheme within the tobacco industry. The source of the omitted income is excess tobacco which is sold via a tobacco dealer card. Because tobacco is a highly regulated commodity, the sales of excess tobacco (without imposition of penalty on the farmer's subsequent year quota) are illegal.  Wells uses individuals and corporate entities as nominees and/or alter egos. No one in the conspiracy reports the receipts. Essentially, the fraud is perpetrated by fictitious purchases on the tobacco dealer's

weekly report to the Agricultural Stabilization and Conservation Service (ASCS).  Against these purchases the dealer is allowed sales at auction of an equal number of pounds.  In actuality, it is the excess tobacco purchased from farmers that is sold on the dealer's card.

Wells used individuals by recruiting people to register with ASCS as a dealer in tobacco, which allowed them to purchase and resell tobacco.  Primarily, purchases were from individuals and resales were primarily at warehouses, but a few exceptions were entered.  When the tobacco is sold at the warehouses, the checks are written to the dealer who is the owner of record.  The dealers endorse the checks and turn them over to Wells or one of his nominees/alter egos who handled his money.  Often they would cash the checks and turn the cash over to Wells or one of his moneymen.  Alternatively, the check will be deposited into a nominee/alter ego corporate account, or the warehouse check may be endorsed over to a co-conspirator, or used directly to purchase an asset.

The dealers are required to file with ASCS weekly reports of all their purchases and sales of tobacco, form MQ-79.  Wells and his inner circle of associates actually prepared and submitted to ASCS the false MQ-79's.  A few of the individuals in the conspiracy were Bud Howard, Albert Earl Vaughan, James Brake, Rodney Howard, Graham Lee Day, Milton J. Elder, Ronald Bowen, Harvey Moore and Harry Lee Roberts.

                *    *    *    *    *    *    *

In addition, other individuals and their controlled corporations were used to launder money and/or hold assets.  These include:

     Harry Lee Roberts and Beaufort Leaf Tobacco
     Dennis Hawley and Coastal Tobacco Co.
     C. L. Gurganus and Gurganus Tobacco Warehouse
     H. D. Pegram and Pegram Tobacco Co.

According to the audit report involving Mr. Wells, various checks made payable to Beaufort Leaf were deposited into accounts controlled by Mr. James V. Wells. Set out below are the dates, amounts, and payors of these checks:

Centura (Planters) Bank Account:

| Date | Amount | Payor | Payee |
|---|---|---|---|
| 9/26/91 | $7,265.90 | Farmers Whse | Beaufort Leaf |
| 9/26/91 | 5,424.50 | Farmers Whse | Beaufort Leaf |
| 9/24/91 | 6,685.14 | New Independent Whse | Beaufort Leaf |
| 9/24/91 | 4,553.33 | New Independent Whse | Beaufort Leaf |
| 9/23/91 | 5,043.50 | New Independent Whse | Beaufort Leaf |
| 9/23/91 | 6,957.42 | New Independent Whse | Beaufort Leaf |
| 9/23/91 | 4,982.96 | New Independent Whse | Beaufort Leaf |
| 9/23/91 | 4,892.93 | New Independent Whse | Beaufort Leaf |
| 9/25/91 | 6,391.56 | New Independent Whse | Beaufort Leaf |
| 9/25/91 | 5,820.56 | New Independent Whse | Beaufort Leaf |
| 9/26/91 | 2,785.54 | New Independent Whse | Beaufort Leaf |
| 9/25/91 | 6,623.22 | Farmers Whse | Beaufort Leaf |
| 9/23/91 | 6,648.22 | Farmers Whse | Beaufort Leaf |
| 9/23/91 | 5,686.96 | Farmers Whse | Beaufort Leaf |
| 9/24/91 | 6,422.40 | Farmers Whse | Beaufort Leaf |

86,184.14

BB & T Account:

| Date | Amount | Payor | Payee |
|---|---|---|---|
| 10/23/91 | $5,567.10 | Big Dixie Whse | Beaufort Leaf |
| 10/23/91 | 2,514.26 | Big Dixie Whse | Beaufort Leaf |
| 10/23/91 | 6,549.91 | Big Dixie Whse | Beaufort Leaf |
| 10/23/91 | 6,682.55 | Big Dixie Whse | Beaufort Leaf |
| 10/23/91 | 2,828.85 | Big Dixie Whse | Beaufort Leaf |
| 10/23/91 | 3,609.56 | Big Dixie Whse | Beaufort Leaf |
| 10/23/91 | 5,404.87 | Big Dixie Whse | Beaufort Leaf |
| 10/23/91 | 5,333.97 | Big Dixie Whse | Beaufort Leaf |
| 10/23/91 | 4,347.10 | Big Dixie Whse | Beaufort Leaf |

42,838.17

First Citizens Bank Account:

| Date | Amount | Payor | Payee |
|------|--------|-------|-------|
| 11/06/91 | $4,974.55 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 6,568.49 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 3,079.56 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 6,726.40 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 5,101.46 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 1,081.65 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 301.81 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 6,723.67 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 3,495.18 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 4,231.81 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 5,910.94 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 6,367.52 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 2,959.36 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 7,190.33 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 6,725.89 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 1,943.41 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 6,549.17 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 3,708.50 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 1,671.69 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 1,794.68 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 5,166.51 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 2,296.31 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 5,062.22 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 5,495.07 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 4,895.64 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 6,437.98 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 5,250.06 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 2,481.27 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 6,109.56 | Big Dixie Whse | Beaufort Leaf |
| 11/06/91 | 2,439.72 | Bob Clark's Whse | Beaufort Leaf |
| 11/07/91 | 3,490.26 | New Greenville | Beaufort Leaf |
| 11/07/91 | 5,947.32 | Big Dixie Whse | Beaufort Leaf |
| 11/07/91 | 6,400.79 | Big Dixie Whse | Beaufort Leaf |
| 11/07/91 | 5,281.77 | Big Dixie Whse | Beaufort Leaf |
| 11/07/91 | 5,677.61 | Big Dixie Whse | Beaufort Leaf |

159,538.16

Respondent concedes that the above checks, totaling $288,560.47, were included in Beaufort Leaf's unreported income for 1991, as determined by respondent. There is no evidence that any other unreported income was related in any way to the scheme to sell excess-quota tobacco.

As a preliminary matter, several comments about the facts of these cases are in order. First, we disagree with petitioners' assertion that the source of all of the unreported income at issue was the "illegal scheme engineered by Harry Lee Roberts whereby Roberts was engaged in numerous sales of over-quota tobacco, in violation of federal law and Department of Agriculture regulations." Petitioners assert that respondent's answer acknowledged that the unreported sales of tobacco were "the direct result" of the illegal scheme. Contrary to petitioners' assertion, respondent's answer admitted only that Mr. Roberts engaged in such a scheme, but it did not admit that the scheme was the source of all or any of the unreported income determined in these cases. As discussed above, there is no evidence that any of the unreported income in 1990 or 1991 was related in any way to the scheme, except for $288,560 in 1991 that was deposited into accounts controlled by Mr. Wells. Even as to this amount, there is nothing in the audit report involving Mr. Wells

which suggests that such amount is not includable in Beaufort Leaf's gross income in 1991.  In passing, we note that petitioners do not claim that such amount is a deductible expense in 1991.

Second, we do not credit the testimony of each petitioner suggesting that he did not know of or approve Beaufort Leaf's participation in the scheme.  Both petitioners owned or had a financial interest in tobacco warehouses and were actively engaged in the tobacco business.  They are knowledgeable and sophisticated members of the relatively small community of persons who engage in that business.  We do not believe that Mr. Roberts' activities in furtherance of the scheme that petitioners describe as widespread, could have escaped the attention of both petitioners.  Indeed, we note that some of the unreported sales were made at the warehouses in which petitioners had an interest.  Furthermore, we do not accept the testimony of each petitioner that he agreed to finance the operation of Beaufort Leaf by cosigning a note for $300,000 and he took no action to supervise those operations by reviewing the partnership's Forms MQ-79 or taking any other action.

Third, we do not accept petitioners' assertion that Beaufort Leaf or petitioners realized no proceeds of, or economic benefit from, Beaufort Leaf's participation in the scheme. The testimony of both petitioners focuses on the list of unreported checks for 1991. Each petitioner testified that he never received the proceeds or economic benefit from those specific checks. Each petitioner also testified that he did not receive moneys or economic benefit from Beaufort Leaf other than what is shown on his income tax returns. However, the testimony of both petitioners leaves open the possibility that moneys or economic benefit was received by other persons or entities related to them. It also leaves open the possibility that moneys or economic benefit was received from someone other than Beaufort Leaf.

In sum, petitioners have not established the facts underlying their argument that the unreported sales determined by respondent were outside the scope of the business of Beaufort Leaf or that petitioners did not know of or receive any economic benefit from the unreported sales of tobacco.

We also disagree with petitioners' argument that respondent failed to meet the Government's burden of establishing a link between petitioners and the underlying

illegal activity.  While it is by no means clear that respondent bears such a burden in this case, there is ample evidence that Beaufort Leaf received the unreported income determined by respondent for 1990 and 1991.  Respondent determined the unreported income for 1990 on the basis of the Forms MQ-79 filed by the partnership for that year. Respondent determined the unreported income for 1991 on the basis of checks made payable to Beaufort Leaf and given to the partnership's managing partner.  Petitioners admit that they were partners in Beaufort Leaf and as partners received withdrawals of moneys from the partnership.  In light of those facts, which are not disputed, there is no basis to conclude that there is an inadequate evidentiary foundation for respondent's determination of unreported income in the subject notices of deficiency or that the notices of deficiency are arbitrary or without rational foundation.  Cf. <u>Williams v. Commissioner</u>, 999 F.2d 760 (4th Cir. 1993); <u>Portillo v. Commissioner</u>, 932 F.2d 1128 (5th Cir. 1991).

<u>Substantiation of Purchases</u>

We turn to the second issue.  Petitioners take the position that respondent erred in reducing Beaufort Leaf's cost of goods sold by disallowing purchases in the amount

of $429,421 in 1990 and $1,173,203 in 1991.  Petitioners acknowledge that "they bear the burden of proof as to substantiation", but they claim in their posttrial brief to have substantiated the subject purchases based upon the following grounds:

(1)  All of the disallowed checks "were issued to individuals or entities that were known tobacco vendors."

(2)  The Forms MQ-79 filed on behalf of Beaufort Leaf "list tobacco pounds for the transactions challenged by Respondent that correspond to the pounds of tobacco represented by the disallowed purchases."

(3)  The subject checks were honored by the banks at which they were presented.

(4)  Beaufort Leaf's accountant, Mr. Dawson, testified that the account payable from Okay Leaf of $350,000 was for tobacco purchases and that testimony is corroborated by the Forms MQ-79 which show tobacco purchases from Okay Leaf in 1991 in excess of $700,000.

(5)  All available books and records of Beaufort Leaf properly record the disputed transactions as purchases of tobacco.

We do not agree that petitioners have substantiated the amounts disallowed by respondent as purchases of tobacco.  None of the points that they advance prove that

any of the disallowed checks or the accounts payable to Okay Leaf was used to purchase tobacco. Petitioners' evidence in the form of the audit report covering Mr. Wells' returns for 1988 through 1991 suggests that Beaufort Leaf sold excess-quota tobacco after having filed fraudulent Forms MQ-79 and paid some of the proceeds of the sales to Mr. Wells or members of his organization. The checks disallowed by respondent are payable to persons identified in the audit report as persons associated with Mr. Wells. The same is true of the account payable to Okay Leaf, a company identified in the audit report as controlled by Mr. Wells. Therefore, petitioners' own evidence suggests that the Forms MQ-79 filed by Beaufort Leaf were falsified to document purchases of tobacco when, in fact, purchases of tobacco were not made by Beaufort Leaf. The audit report suggests that the checks were issued to persons related to Mr. Wells in order to transmit proceeds of the scheme to Mr. Wells. Furthermore, we note that petitioners did not seek testimony from any of the check payees or Okay Leaf to show the nature of the payments made. See <u>Wichita Terminal Elevator Co. v. Commissioner</u>, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947). We also note that petitioners do not claim that the checks were paid for any purpose other

than to purchase tobacco or that they are deductible in connection with an activity other than Beaufort Leaf's business of purchasing and selling tobacco. Cf. Brizell v. Commissioner, 93 T.C. 151 (1989).

Penalties and Additions to Tax

The third issue for decision is whether petitioners are liable for the penalties and addition to tax determined in the notices of deficiency. Respondent determined an accuracy-related penalty under section 6662(a) with respect to each petitioner's returns for 1990 and 1991. Section 6662 imposes a penalty of 20 percent of the portion of an underpayment of tax related to, inter alia, "Negligence or disregard of rules or regulations" or "Any substantial understatement of income tax". For this purpose, the term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the income tax, and the term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c). In substance, an understatement of income tax is the excess of the amount of tax required to be shown on the taxpayer's return over the amount that is shown on the return. See sec. 6662(d)(2)(A). A substantial understatement is defined by section 6662(d)(1)(A) as an understatement exceeding

the greater of "10 percent of the tax required to be shown on the return for the taxable year, or * * * $5,000."

Petitioners' answering brief addresses the penalties under section 6662(a) determined by respondent in the following sentence:

> Finally, if the Court rules in favor of the Respondent, the Petitioners request that the Court waive penalties and interest associated with the understatement of income as the Petitioners filed their tax forms in good faith, reasonably relying on the managing partner and the partnership bookkeeper's expertise to file a complete and accurate tax return for the partnership.

This Court has jurisdiction over interest determinations to the limited extent provided by section 7481(c), which is not applicable here. Nor does section 6404(i) apply in the absence of a determination by respondent not to abate interest. See Melin v. Commissioner, 54 F.3d 432 (7th Cir. 1995). Therefore, we shall not consider petitioners' request that this Court "waive" the "interest associated with the understatement."

We interpret petitioners' request that this Court "waive penalties * * * associated with the understatement" as an assertion that they qualify to be relieved of liability for the subject penalties under the reasonable

cause exception set forth in section 6664(c).  Section 6664(c)(1) provides as follows:

> (1) In General.--No penalty shall be imposed under this part with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion.

Petitioners have not shown that there was reasonable cause for the underpayment in this case or that they acted in good faith.  In this regard, we point to the earlier discussion in this opinion in which we did not accept petitioners' testimony that they did not know of or approve Beaufort Leaf's participation in the scheme.

Respondent also determined that Mr. Gaskins is liable for an addition to tax under section 6651(a)(1) for failing to timely file his 1991 tax return on the ground that the return was filed after October 15, 1992, the due date of the return.  Respondent's determination is based upon the postmark on the envelope in which Mr. Gaskins' return was mailed to the Internal Revenue Service.  Petitioners did not address this issue at trial or mention it in their posttrial briefs.  Accordingly, we hereby sustain respondent's determination and find Mr. Gaskins liable for the addition to tax under section 6651(a)(1).

In light of the foregoing,

Decisions will be entered

for respondent.