UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

MARK D. PRIDGEN; DEWEY R.
GASKINS,

*Petitioners-Appellants,*

and

KAY D. PRIDGEN; FRANCINE P.
GASKINS,

*Petitioners,*

v.

INTERNAL REVENUE,

*Respondent-Appellee.*

No. 99-2313

Appeal from the United States Tax Court.
(T. Ct. Nos. 97-2048, 97-2075)

Argued: September 27, 2000

Decided: January 22, 2001

Before WILLIAMS and KING, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Trawick Hamilton Stubbs, Jr., STUBBS & PERDUE,
P.A., New Bern, North Carolina, for Appellants. Charles Foster Mar-
shall, III, Tax Division, UNITED STATES DEPARTMENT OF JUS-

TICE, Washington, D.C., for Appellee. **ON BRIEF:** Paula M. Junghans, Acting Assistant Attorney General, Ann B. Durney, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

In 1987, Mark D. Pridgen and Dewey R. Gaskins ("the taxpayers"), along with Harry Lee Roberts,[1] formed Beaufort Leaf Tobacco Company, a North Carolina general partnership, for the principal purpose of buying and selling tobacco; they continued in business until 1992. In this appeal, we are called upon to decide whether the United States Tax Court erred in finding the taxpayers liable for deficiencies, interest, and penalties due on their 1990 and 1991 federal income tax returns because Beaufort Leaf failed to report all of its income from sales of tobacco and failed to substantiate alleged tobacco purchases claimed as cost of goods sold. We hold that the tax court did not err in finding that the unreported sales of excess and nonexistent quota tobacco fell within the scope of the partnership business under North Carolina law and that the tax court did not err in disallowing unsubstantiated tobacco purchases claimed as cost of goods sold. Finally, we hold that the tax court's finding that the taxpayers are liable for accuracy-related penalties under I.R.C. § 6662 is not clearly erroneous. Accordingly, we affirm the decision of the tax court.

### I.

On November 1, 1996, the Commissioner of the Internal Revenue Service issued notices of deficiency to Mark D. and Kay D. Pridgen

---

[1]Roberts was deceased at the time of the hearing before the tax court.

and to Dewey R. and Francine P. Gaskins for the taxable years 1990 and 1991. In addition to the deficiencies, the Commissioner assessed penalties for the taxable years in question.[2] On February 3, 1997, the Pridgens and the Gaskinses filed petitions for redetermination of the deficiencies and penalties. The United States Tax Court had jurisdiction over the petitions pursuant to I.R.C. §§ 6213(a) and 7442. The tax court consolidated the cases for trial, briefing, and opinion. In a Stipulation of Facts filed on March 3, 1998, the parties agreed that Kay D. Pridgen and Francine P. Gaskins were entitled to innocent spouse relief for the taxable years in question under I.R.C. § 6013(e). On July 13, 1999, the tax court entered decisions sustaining the Commissioner's determinations against the taxpayers. On September 27, 1999, the taxpayers filed a timely notice of appeal.

In the Stipulation of Facts, the parties agreed that

> [u]nder Beaufort Leaf's oral partnership agreement, each partner held a one-third distributive share of all partnership income, gain, loss, deduction, or credit (computed after taking into account guaranteed payment of $30,000 to Mr. Roberts for each taxable year). Mr. Roberts caused Beaufort Leaf to file a U.S. Partnership Return of Income (Form 1065) for each of the taxable years 1990 and 1991.

(J.A. at 22.) Roberts was responsible for the day-to-day operations and management of Beaufort Leaf, while the taxpayers financed the partnership operations by co-signing a note for $300,000.

---

[2]For taxable year 1990, Pridgen was assessed a deficiency of $129,169 and a penalty under I.R.C. § 6662(a) of $25,834; for taxable year 1991, Pridgen was assessed a deficiency of $232,416 and a penalty under § 6662(a) of $46,483. For taxable year 1990, Gaskins was assessed a deficiency of $131,723 and a penalty under § 6662(a) of $26,345; for taxable year 1991, Gaskins was assessed a deficiency of $240,086 and a penalty under § 6662(a) of $48,017. An addition to tax pursuant to I.R.C § 6651(a)(1) of $12,004 was also assessed against Gaskins for the 1991 taxable year. The deficiencies were determined based upon adjustments to each taxpayer's distributive share of Beaufort Leaf's net income for each taxable year.

The marketing of tobacco is regulated by the United States Department of Agriculture ("USDA"), which uses a quota system to control the amount of tobacco bought and sold. *See generally* 7 U.S.C.A. §§ 1311-1316 (1999 & Supp. 2000) (providing overview of statutory quota system); *Cole v. USDA*, 33 F.3d 1263, 1265-66 (11th Cir. 1994) (providing an overview of the statutory and regulatory framework). "The amount of tobacco marketed is controlled by a quota system that establishes an allotment to each tobacco-producing farm." *Cole*, 33 F.3d at 1265. A penalty is specified in 7 U.S.C.A. § 1314(a) for the marketing of tobacco in excess of a producer's allotment. Dealers who resell excess-quota tobacco also are subject to a penalty. *See* 7 C.F.R. § 723.410(g) (1993).

The USDA monitors the marketing of excess-quota tobacco through a record-keeping system designed to account for all tobacco sales and purchases. As an integral part of this record-keeping system, dealers, like Beaufort Leaf, are required to keep a Dealer's Record on form MQ-79 issued by the USDA. *Cole*, 33 F.3d at 1265. The form MQ-79 is a comprehensive record filed weekly with the Agricultural Stabilization and Conservation Service ("ASCS") that reports the date and amount of each purchase or resale of tobacco, the identity of the seller or purchaser, the pounds purchased, the price, and a running balance of the amount of tobacco on hand after each transaction. *See* 7 C.F.R. § 723.404 (1983). When purchases or resales are made at auction, the dealer's MQ-79 lists the warehouse at which the purchase or sale is made and is signed by a warehouse representative.

As explained by the Eleventh Circuit in *Cole*,

> The [USDA] issues a marketing card to each producer. A marketing card shows the producer's total allotment or quota; every time the producer sells tobacco, the quantity of the sale is noted on the card. Purchasers from a producer should, and as a practical matter do, look at the producer's card at the time of each purchase; and thus, it is readily apparent to any purchaser when the producer has sold his quota of tobacco. In addition, parties who purchase tobacco (including dealers) are required to report the amount of each purchase to the USDA. Similarly, each purchaser is required

> to report each resale. Thus there is a reported accounting each time the ownership of a pound of tobacco changes.

*Cole*, 33 F.3d at 1265-66.

Roberts personally performed all buying and selling of tobacco for Beaufort Leaf during the taxable years 1990 and 1991. According to documents entered into evidence and to witness testimony, all of Roberts's tobacco sales were made in Beaufort Leaf's name, and all checks were made payable to Beaufort Leaf. Many of Roberts's sales, however, were not deposited in the partnership bank account or recorded on the partnership books. Beaufort Leaf's Forms 1065 reported gross receipts from tobacco sales of $1,264,700 in 1990 and $2,849,451 in 1991.[3] According to the Stipulation of Facts, the gross receipts reported on Beaufort Leaf's Forms 1065 were computed by their accountant solely based upon the deposits made into Beaufort Leaf's bank accounts and were reduced by deposits identified by Roberts as borrowed funds.

For both 1990 and 1991, the unreported gross receipts, as determined by the Commissioner, represent proceeds from sales of tobacco that were not deposited into Beaufort Leaf's bank account and were not otherwise reflected in the partnership's books or records. In 1990, Beaufort Leaf's MQ-79s, along with three receipts documenting the sale of tobacco by Beaufort Leaf to one E.D. Peagram, showed total tobacco sales of $2,153,228. Of this amount, Beaufort Leaf reported only $1,264,700 of these sales on its return. Thus, the Commissioner determined that in 1990 Beaufort Leaf failed to report $888,528 of Roberts's sales as partnership income.

Similarly, the Commissioner determined that tobacco sales in 1991 totaled $3,904,027 instead of the $2,849,451 shown on Beaufort Leaf's returns. As a result, the Commissioner increased Beaufort Leaf's income by $1,054,576 for 1991. The unreported sales are documented by a list of 247 checks from warehouse auction sales that were made payable to Beaufort Leaf but not deposited into its account. This list of undeposited checks also reports the amount and

---

[3]These figures are rounded to nearest whole dollar.

date of each sale and the name of the warehouse where the sale took place. Of these unreported sales, seventy-five took place in Big Dixie Warehouse, which taxpayer Gaskins purchased in 1990, and six took place in Bob Clark's Warehouse, in which taxpayer Pridgen had an ownership interest.

The Commissioner sent the taxpayers notices of deficiency for 1990 and 1991, determining that the unreported tobacco sales constituted income to Beaufort Leaf and that the taxpayers were liable for the tax on their distributive shares of this income. The Commissioner also disallowed $429,421 of Beaufort Leaf's cost of goods sold for 1990 and $1,173,203 of its cost of goods sold for 1991 because those amounts did not represent ordinary and necessary business expenses. The Commissioner also assessed the taxpayers accuracy-related penalties under I.R.C. § 6662 because they substantially understated their tax liability, or, in the alternative, because their understatement was due to negligence. The taxpayers challenged the Commissioner's findings and the case proceded to trial before the tax court.

The parties agree that Roberts was engaged in a scheme during 1990 and 1991 to fraudulently use Beaufort Leaf's MQ-79s. Pursuant to this scheme, Roberts and other tobacco dealers defrauded the USDA by selling excess quota or nonexistent quota tobacco. These dealers conspired together to create nonexistent quota tobacco by entering false tobacco purchases on bogus dealers' MQ-79s. The participants in this scheme then bought tobacco inventory in cash transactions directly from farmers who had produced excess farm quota tobacco. With excess quota tobacco purchased directly from the farmers in hand and MQ-79s falsified to make the purchases look legitimate, various bogus and legitimate dealers were able to sell excess quota tobacco at warehouse auction and make a profit.

The record indicates that this scheme to buy and sell excess-quota tobacco was masterminded by James V. Wells. At trial, the taxpayers introduced an examination report of Wells's tax returns for 1988-1991 ("the Wells report"), which describes the scheme in detail. According to the Wells report, Wells used individuals and corporate entities as nominees and/or alter egos. When the tobacco was sold at a warehouse, the check was written to the dealer who was the owner of record. The dealer endorsed the check and handed it over to Wells

or one of his nominees/alter egos who handled Wells's money. Often the endorsed check was cashed and the money was turned over to Wells or one of his moneymen. Alternatively, the check was deposited into a nominee/alter ego business account, endorsed over to a co-conspirator, or used directly to purchase an asset. No one in the scheme reported the receipts.

Roberts was identified by the Wells report as one of the individuals involved in the scheme. The Wells report also noted that "other individuals and their controlled corporations were used to launder money and/or hold assets." *Pridgen v. Comm'r*, 77 T.C.M. (CCH) 2117 (1999). Among these were Roberts and Beaufort Leaf. Despite Roberts's involvement with Wells, the tax court found evidence that only $288,560 of Beaufort Leaf's unreported sales for 1991 were deposited into accounts controlled by Wells.

Beaufort Leaf's Forms 1065 reported that Beaufort Leaf's cost of goods sold included tobacco purchases totaling $1,057,163 for 1990 and $2,713,562 for 1991. The tobacco purchases reported on the Forms 1065 were based primarily upon cancelled checks, plus some accounting adjustments and entries. One such entry stated that for 1991, Beaufort Leaf had an account payable of $350,000 for tobacco purchased from Okay Leaf. The tax court found that the cancelled checks disallowed by the Commissioner are payable to persons identified in the Wells report "as persons associated with Mr. Wells." *Id.* "The same is true of the account payable to Okay Leaf, a company identified in the [Wells] report as controlled by Mr. Wells." *Id.* The taxpayers did not call any of the check payees to testify as to the nature of the payments made.

Based upon the evidence presented at trial, the tax court sustained the Commissioner's determinations of deficiencies and penalties. *See id.* First, the tax court found that the unreported tobacco sales constituted additional income to Beaufort Leaf. The tax court rejected the taxpayers' argument that the unreported sales were outside the scope of the partnership, finding that, at most, only $288,560 of the unreported income for 1991 was related to the Wells scheme. The tax court discredited the taxpayers' testimony that they did not know or approve of Beaufort Leaf's participation in the Wells scheme, noting that the taxpayers had financial interests in tobacco warehouses where

sales in the scheme took place and that the taxpayers were knowledgeable members of a relatively small tobacco community.

Next, the tax court found that the taxpayers were not entitled to deduct tobacco purchases of $429,421 in 1990 and $1,173,203 in 1991 as cost of goods sold. Although the taxpayers presented evidence of cancelled checks "issued to individuals or entities that were known tobacco vendors" to substantiate the purchases in question, the tax court found that the taxpayers failed to verify that the checks were for actual purchases of tobacco by calling any of the payees to testify. *Id.* The tax court further found that the taxpayers' own evidence regarding Wells's scheme suggested that Roberts had issued checks to the tobacco companies to transmit proceeds from the sale of excess quota tobacco, after falsifying tobacco purchases on the MQ-79s. *Id.* In support of this finding, the tax court noted that the checks disallowed by the Commissioner were written to persons identified in the Wells report as associates of Wells. *Id.*

Last, the tax court found that the taxpayers were liable for accuracy-related penalties under I.R.C. § 6662 for substantially understating the amount of income tax that they owed. The tax court ruled that the taxpayers were not entitled to an exception from the penalties for "reasonable cause" or "good faith," *see* I.R.C. § 6664(c), because the tax court previously had found that the taxpayers knew or approved of Beaufort Leaf's participation in the Wells scheme.

The taxpayers raise several issues on appeal related to the tax court's ruling. The taxpayers argue that the tax court erred by finding, first, that under North Carolina partnership jurisprudence the sales of excess and nonexistent quota tobacco fell within the scope of Beaufort Leaf's business and, second, that the taxpayers failed to substantiate tobacco purchases claimed as cost of goods sold. Finally, the taxpayers assert that the tax court erred by finding them liable for accuracy-related penalties under I.R.C. § 6662. We address each argument in turn.

II.

We note at the outset that "[i]t is well established that as a general matter, the Commissioner's determination of deficiency is presumed

correct, and the taxpayer bears 'the burden of proving it wrong'" before the tax court. *Cebollero v. Comm'r*, 967 F.2d 986, 990 (4th Cir. 1992) (quoting *Welch v. Helvering*, 290 U.S. 111, 115 (1933)); *see also Helvering v. Taylor*, 293 U.S. 507, 515 (1935) (noting that the burden of proof is on the taxpayer to invalidate the Commissioner's determination). When the taxpayer appeals a decision of the tax court, the tax court's factual findings must be affirmed unless they are clearly erroneous. *Hendricks v. Comm'r*, 32 F.3d 94, 97 (4th Cir. 1994). "The tax court's decision is clearly erroneous only where 'although there is evidence to support it, on the entire evidence the reviewing court is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Faulconer v. Comm'r*, 748 F.2d 890, 895 (4th Cir. 1984)). However, mixed questions of law and fact are reviewed de novo when the reviewing court must consider legal concepts and exercise judgment about the values underlying those legal principles. This is particularly true when the tax court interprets state law and draws conclusions about federal tax liability based upon characterization of state legal principles. *Walters v. Commissioner*, 48 F.3d 838, 842 (4th Cir. 1995).

We hold that the tax court did not err in finding that, under North Carolina law, the unreported sales of excess and nonexistent quota tobacco fell within the scope of Beaufort Leaf's partnership business. The North Carolina Uniform Partnership Act states, in relevant part,

> (a) Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority.

N.C. Gen. Stat. Ann. § 59-39(a) (Lexis 1999).

In this case, Roberts was authorized to sell tobacco on behalf of Beaufort Leaf. According to the Stipulation of Facts, "Roberts personally performed all buying and selling of tobacco for Beaufort Leaf

during the taxable years 1990 and 1991." (JA 24.) As a general partner of Beaufort Leaf, Roberts was a general agent. *Investors Title Ins. Co. v. Herzig*, 360 S.E.2d 786, 789 (N.C. 1987). There is no evidence to suggest that those with whom Roberts dealt would have had any reason to know that Roberts was not authorized to sell tobacco to them. For example, a witness who had purchased tobacco from Roberts testified at trial that because Roberts made all tobacco sales in the same manner, excess-quota sales would have been indistinguishable from authorized within-quota tobacco sales. Moreover, the purchasers made all checks payable to Beaufort Leaf, demonstrating that they believed they were buying the tobacco from the partnership rather than from Roberts individually. Although there are circumstances when a person dealing with an agent bears the responsibility of knowing the extent of the agent's authority, this is not true when dealing with one who is a general agent. *Herzig*, 360 S.E.2d at 788. "In such case the burden is on the principal to show that the other party had notice of a restriction upon the power of the general agent." *Id.*; N.C. Gen. Stat. Ann. § 59-39(a).

Further, the tax court did not find credible the taxpayers' testimony that they did not "know of or approve Beaufort Leaf's participation in" Roberts's illegal activities. *Pridgen v. Comm'r*, 77 T.C.M. (CCH) 2117 (1999). The tax court noted

> Both petitioners owned or had a financial interest in tobacco warehouses and were actively engaged in the tobacco business. They are knowledgeable and sophisticated members of the relatively small community of persons who engage in that business. We do not believe that Mr. Roberts' activities in furtherance of the scheme that petitioners describe as widespread, could have escaped the attention of both petitioners. Indeed, we note that some of the unreported sales were made at the warehouses in which petitioners had an interest. Furthermore, we do not accept the testimony of each petitioner that he agreed to finance the operation of Beaufort Leaf by cosigning a note for $300,000 and he took no action to supervise those operations by reviewing the partnership's Forms MQ-79 or taking any other action.

*Id.* The tax court continued by explicitly rejecting the taxpayers' assertion that neither they nor Beaufort Leaf realized any proceeds or

economic benefit from Beaufort Leaf's participation in the scheme. The tax court noted that the taxpayers' testimony left open the possibility that "moneys or economic benefit was received by other persons or entities related to them. It also leaves open the possibility that moneys or economic benefit was received from someone other than Beaufort Leaf." *Id.* Such credibility and factual determinations are properly within the discretion of the trial court, and, in this case, taxpayers have not shown that those findings were clearly erroneous.

Given the findings of the trial court, the taxpayers were properly taxed on their distributive shares of partnership income. Partnerships are not taxed at the entity level. *See* I.R.C. § 701. Instead, the individual partners are taxed on their distributive shares of the partnership income on their federal income tax returns. *See* I.R.C. §§ 701-704. This holds true even if the partner does not actually receive his share of the income. *See, e.g.*, Treas. Reg. § 1.702-1(a) (stating that "[e]ach partner is required to take into account separately in his return his distributive share, *whether or not distributed*, of each class or item of partnership income, gain, loss, deduction, or credit" (emphasis added)). An individual partner also is taxed on his distributive share even if he is not aware of the income received. *See Brooks v. Comm'r*, 70 T.C.M. (CCH) 458 (1995) (holding that "[a] partner is taxable on her distributive share of partnership income regardless of whether she receives it or is even aware of its existence."). A partner also is taxed on his distributive share of partnership income when "another partner has embezzled it without his knowledge." *Stern v. Comm'r*, 48 T.C.M. (CCH) 605 (1984) (noting that "we have held that the fact that a partner is somehow defrauded by another partner does not relieve the deceived partner from tax liability with respect to his or her distributive share of partnership income"). The Supreme Court pointedly has noted that "[f]ew principles of partnership taxation are more firmly established than that no matter the reason for nondistribution each partner must pay taxes on his distributive share." *United States v. Basye*, 410 U.S. 441, 454 (1973).[4] The facts, reflected in the record

---

[4]The seeming harshness of this rule is mitigated by the theft loss deduction allowed under I.R.C. § 165(c)(3). "[A]ny loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss." I.R.C. § 165(e). In this case, the taxpayers did not seek such relief.

and as found by the tax court, require the legal conclusion that each taxpayer is liable for the tax on his one-third distributive share of the proceeds from Beaufort Leaf's unreported tobacco sales.

### III.

Taxpayers next argue that the tax court erred in finding that they failed to substantiate tobacco purchases claimed as cost of goods sold. The taxpayers bear the "burden of proving the amount of the deductible expenses since deductions are a matter of statutory privilege and must be shown by substantial evidence." *Nowland v. Comm'r*, 244 F.2d 450, 453 (4th Cir. 1957); *see also Cummings v. Comm'r*, 410 F.2d 675, 679 (5th Cir. 1969) (observing that "the burden is upon the taxpayer to establish a statutory right to specific deductions and to substantiate his eligibility therefor"). "Whether the taxpayer has produced sufficient evidence to support a deduction is a question of fact which [is reviewed] for clear error." *United States v. Wisconsin Power & Light Co.*, 38 F.3d 329, 337 (7th Cir. 1994); *see also Norgaard v. Comm'r*, 939 F.2d 874, 877 (9th. Cir. 1991) (same).

In this case, Beaufort Leaf claimed tobacco purchases as cost of goods sold totaling $1,057,163 for 1990 and $2,713,562 for 1991. The tax court found that the taxpayers did not substantiate the amounts disallowed by the Commissioner as purchases of tobacco. Specifically, the tax court found that the taxpayers' own evidence suggested that Beaufort Leaf filed falsified MQ-79s to document purchases of tobacco that Beaufort Leaf never made. The tax court noted that an audit report indicated that many of the disallowed checks were issued to persons related to Wells in order to transmit to Wells proceeds of the scheme. In fact, one of the checks was made payable to Wells himself. Moreover, the taxpayers' failure to present any of the check payees as witnesses raises an "inference drawn from other facts in the case" that such testimony would have been adverse to the taxpayers. *See, e.g.*, *Wichita Terminal Elevator Co. v. Comm'r*, 162 F.2d 513, 515-16 (10th Cir. 1947) ("[A]n inference of fact drawn by [the tax court] is not to be overturned on review if it is reasonable and has substantial support in the evidence."); *Comm'r v. Scottish American Inv. Co.*, 323 U.S. 119, 124 (1944) ("And when the Tax Court's factual inferences and conclusions are determinative of compliance with statutory requirements, the appellate courts are limited to a determina-

tion of whether they have any substantial basis in the evidence."); *see also Mammoth Oil Co. v. United States*, 275 U.S. 13, 52 (1927) ("While [defendant corporation's agent's] failure to testify cannot properly be held to supply any fact not reasonably supported by the substantive evidence in the case, it justly may be inferred that he was not in position to combat or explain away any fact or circumstance so supported by evidence . . . ." (citations omitted)). Furthermore, the taxpayers did not claim that the checks were issued for any purpose other than to purchase tobacco or that they were deductible in connection with an activity other than Beaufort Leaf's business of purchasing and selling tobacco.

In light of the evidence that Roberts and the payees on the checks were involved in the Wells scheme, the tax court reasonably did not unquestioningly accept the checks as evidence of tobacco purchases. *See, e.g.*, *Young v. Comm'r*, 57 T.C.M. (CCH) 436 (1989) (refusing to accept checks at face value as substantiation of rental expenses or to "place any reliance on the 'memo references' appearing on the face of the checks"); *Bailey v. Comm'r*, 49 T.C.M. (CCH) 141 (1984) (finding that checks were not sufficient to support the purchase of athletic equipment as a business expense).

In an attempt to buttress their argument that the tax court erred in holding that the taxpayers failed to substantiate the disallowed purchases as purchases of tobacco, the taxpayers offer a statistical expectation of income that they argue reflects the evidence and common tobacco industry expectations. They rely upon evidence provided at trial, specifically the 1990 and 1991 tax returns for Beaufort Leaf, that they claim demonstrates that the partnership incurred a net profit equal to 10-15% of gross sales for the years in question. The taxpayers further argue that these amounts are consistent with cost or profit margin percentages provided by witnesses for the taxpayers. Beaufort Leaf's accountant testified that "if you look at the overall picture, when it wind [sic] up in the end of the year, I'm thinking 10 to 15 percent would be a pretty good profit." (J.A. at 212.) Another witness testified that he considered "somewhere around 6 to 7 percent" a normal gross profit margin for tobacco sales of this kind. (J.A. at 258.) As a result, the taxpayers argue that reducing the allowed cost of goods sold in the manner suggested by the Commissioner would

reflect a level of net income that is simply not consistent with the evidence or with common tobacco industry expectations.

Despite the taxpayers' suggestions to the contrary, however, the tax court was not required to estimate the net profit earned by the taxpayers in this case in calculating the allowable cost of goods sold. The taxpayers primarily rely upon *Cohan v. Comm'r*, 39 F.2d 540 (2d Cir. 1930). In *Cohan*, the taxpayer estimated that he had expenses of $55,000 over approximately a two year period. *See id.* at 543. "The Board refused to allow him any part of this, on the ground that it was impossible to tell how much he had in fact spent, in the absence of any items or details." *Id.* The Second Circuit held that the Board of Tax Appeals went too far in denying the taxpayer any of his expenses. The court noted, "[a]bsolute certainty in such matters is usually impossible and is not necessary; the Board should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making." *Id.*; *see also Millikin v. Comm'r*, 298 F.2d 830, 834 (4th Cir. 1962) (recognizing the "*Cohan* rule"); *Arevalo v. Comm'r*, 78 T.C.M. (CCH) 634 (1999) (citing *Cohan*). "However, there must be sufficient evidence in the record to permit the Court to conclude that a deductible expense was incurred in at least the amount allowed." *Arevalo*, 78 T.C.M. (CCH) 634.[5]

*Cohan* is inapplicable to this case. First, this is a case "where the claimed but unsubstantiated deductions are of a sort for which the taxpayer could have and should have maintained the necessary records." *Lerch v. Comm'r*, 877 F.2d 624, 628 (7th Cir. 1989). Under such circumstances "[t]he tax court was under no obligation to guess as to the amount of the . . . expenses." *Buelow v. Comm'r*, 970 F.2d 412, 415 (7th Cir. 1992); *see also Lerch*, 877 F.2d at 628 (following the "present trend" in refusing to invoke the *Cohan* rule where the taxpayer

---

[5]Even if estimation were applicable in this case, the taxpayers failed to present sufficient evidence of average profits earned by tobacco dealers in 1990 and 1991. An assessment of profit margin averages in the tobacco industry is "specialized knowledge" for which expert testimony is required. *See* Fed. R. Evid. 702. Neither of the witnesses who testified about profit margin averages in the tobacco business was qualified as an expert.

failed to maintain the proper records); *Lutheran Mut. Life Ins. Co. v. U.S.*, 816 F.2d 376, 379 (8th Cir. 1987) (observing that "given the lack of evidentiary support for taxpayer's claimed deductions, we cannot say that the trial court erred in declining to uphold at least some deduction under *Cohan*"); *Bay Sound Transp. Co. v. U.S.*, 410 F.2d 505, 511 (5th Cir. 1969) ("The record fails to reveal that [taxpayer] proved even a portion of his expenses to be deductible."). No records were maintained to substantiate Roberts's claim that the disallowed checks were for tobacco purchases. Beaufort Leaf's accountant testified that he had no independent knowledge of the purpose of the disallowed checks. Roberts never provided the accountant "with any receipts or invoices or other documents to show that these checks were, in fact, for tobacco purchases." (J.A. at 214.) This is true as well of the $350,000 account payable "owed" by the partnership to Okay Leaf.

Second, other courts have distinguished the *Cohan* estimation of the cost of goods sold on bases that are likewise applicable here. In *Allen v. Comm'r*, 26 T.C.M. (CCH) 493 (1967), the tax court held that where the Commissioner "did not disallow the expenses claimed in full and, in fact, allowed a substantial portion of them, petitioner should come forward with persuasive evidence to establish that he is entitled to a greater allowance." *Id.* Similarly, the tax court in *Schultz v. Comm'r*, 44 B.T.A. 146, 151 (1941), held *Cohan* inapplicable in a case where the Commissioner disallowed approximately 75% of expenses claimed where the taxpayers offered nothing more than a general statement of how the amounts were spent. In *Schultz*, the tax court noted that the Commissioner "recognized that 'something was spent', and . . . made presumably 'as close an approximation' as he could. There is nothing upon which the Board can base a different or greater approximation." *Id.* Like *Allen* and *Schulz*, this case is inapposite to *Cohan*. In *Cohan*, the Commissioner estimated that the taxpayer had expenses of over $55,000 but refused to allow him any portion of this amount. *Cohan*, 39 F.2d at 543. Here, the Commissioner had allowed taxpayers all expenses in 1990 and 1991 that appeared legitimate—$627,472 in 1990 and $1,000,359 in 1991. The tax court found that the taxpayers offered no "persuasive evidence" to establish that they were entitled to a greater allowance because the disallowed checks were payable to associates of the Wells scheme and therefore were of questionable authenticity. Thus, the taxpayers

did not adequately substantiate "the amounts disallowed by respondent as purchases of tobacco." *Pridgen*, 77 T.C.M. (CCH) 2117. Based on the facts and the legal analysis above, we find the *Cohan* estimation of cost of goods sold inapplicable.

After considering and rejecting all of the taxpayers' arguments on this issue, we conclude that the tax court did not err in finding that the taxpayers failed to substantiate all of the tobacco purchases claimed as cost of goods sold.

IV.

Finally, the taxpayers argue that the tax court erred in finding that the taxpayers were liable for accuracy-related penalties in addition to the tax determined in the notices of deficiency. We review the tax court's finding that the taxpayers are liable for penalties "under the clearly erroneous standard unless 'there has been an erroneous interpretation of the applicable legal standard.'" *Antonides v. Comm'r*, 893 F.2d 656, 659 (4th Cir. 1990) (quoting *Faulconer v. Comm'r*, 748 F.2d 890, 895 (4th Cir. 1984)).

Internal Revenue Code § 6662(a), in conjunction with § 6662(b)(1) and (2), imposes a penalty equal to 20% of the underpayment of tax attributable to "[n]egligence or disregard of rules or regulations" or "any substantial understatement of income tax." I.R.C. § 6662(b)(1), (2). "[T]here is a substantial understatement of income tax for any taxable year if the amount of the understatement for the taxable year exceeds the greater of — (i) 10 percent of the tax required to be shown on the return for the taxable year, or (ii) $5,000." I.R.C. § 6662(d)(1)(A)(i), (ii). The taxpayers in this case qualify for the penalties based on a substantial understatement of their income tax.

Section 6664(c), however, provides a "reasonable cause exception to penalties imposed under § 6662." Under § 6664(c), "[n]o penalty shall be imposed under this part with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." I.R.C. § 6664(c)(1). Here, the tax court found that "[p]etitioners have not shown that there was reasonable cause for the underpayment in this case or that they have acted in good faith." *Prid-*

*gen v. Comm'r*, 77 T.C.M. (CCH) 2117 (1999). The tax court pointed to its finding that it "did not accept petitioners' testimony that they did not know of or approve Beaufort Leaf's participation in the scheme." *Id.* The taxpayers' only counter to this finding is that the tax court continued to use its disregard of the taxpayers' testimony as its only theme for upholding the Commissioner's determination in its entirety. The tax court, however, was entitled to do so. The tax court heard all the evidence in this case. It was uniquely situated to make findings of fact and to judge the credibility of the witnesses. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985). "The tax court's assessment of the credibility of witnesses and its findings of fact are entitled to substantial deference and are not subject to reversal unless clearly erroneous." *Cebollero v. Comm'r*, 967 F.2d 987, 992 (4th Cir. 1992) (internal quotations omitted). We are unable to hold that the tax court's findings on this issue are clearly erroneous.

V.

In conclusion, the tax court did not err in finding that the unreported sales of excess and nonexistent quota tobacco fell within the scope of Beaufort Leaf's business under North Carolina law and in finding that the taxpayers failed to substantiate tobacco purchases claimed as cost of goods sold. We also affirm the tax court's determination that the taxpayers are liable for accuracy-related penalties under I.R.C. § 6662, as well as deficiencies and interest due on their 1990 and 1991 returns. Accordingly, the decision of the tax court is affirmed.

*AFFIRMED*