IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

QUARREN AVAKIAN,                 )
                                    )
         Plaintiff,           )   TC-MD 180258N
                                      )
       v.                     )
                                      )
DEPARTMENT OF REVENUE,     )
State of Oregon,               )
                                    )
        Defendant.      )   **DECISION**

      Plaintiff appealed Defendant's Notice of Assessment, dated March 27, 2018, for the 2012

tax year. A trial was held on March 14, 2019, in the courtroom of the Oregon Tax Court.

Dominic Paris, an Oregon attorney, appeared on behalf of Plaintiff. Plaintiff testified on his own

behalf. Darren Weirnick, Senior Assistant Attorney General, appeared on behalf of Defendant.

Michelle Warren, Senior Tax Auditor, testified on behalf of Defendant. Plaintiff's Exhibits 1 to

6, 17 to 19, and 25 to 27, and Defendant's Exhibits A to H, J, and M to Q were received without

objection. The parties' written closing arguments were filed on March 20, 2019.

## I. STATEMENT OF FACTS

      In 2012, Plaintiff operated three gas stations. He ran Halsey Shell Gas Station through Q

Pioneer LLC (Q Pioneer) and reported income and expenses on his Schedule C. (*See* Def's Ex G

at 5.) Plaintiff operated Jack's Truck Stop (Jack's) and Jerry's Chevron (Jerry's) through Bella-

Genik Corp. (Bella-Genik), his wholly owned S Corporation. (*See* Def's Exs D at 1, H.) All the

gas stations used the accrual basis method of accounting. (Def's Exs G at 5, H at 2.) The only

adjustment at issue is one Defendant made to Jack's gross income. Warren testified that she

adjusted Jack's shareholder payables by approximately $400,000 after Plaintiff failed to provide

documents to support four journal entries. (*See* Def's Ex J at tab 35 (highlighted).)

A.      *Plaintiff's Business and Purported Loan*

Plaintiff testified that he established Bella-Genik in 2002 and the business went well for several years until his wife fell ill in 2006 and passed way in 2009.  Thereafter, he was caring for their children and lost his concentration on the businesses.  Plaintiff testified that he lost his usual bookkeeper in 2012 and hired three other individuals to perform bookkeeping that year.  That resulted in problems with Plaintiff's books that his CPA tried to resolve.

Plaintiff testified that he had a line of credit with Jackson Oil, which was Bella-Genik's sole diesel and gas supplier.  The line of credit extended for 10 days.  In March 2012,[1] Plaintiff reached the 12th day and owed a balance of $460,000 for eight or nine loads of fuel.  Plaintiff could not borrow from a bank, so he borrowed from his mother.  Plaintiff made a deal with Jackson Oil to pay $200,000 in March.  His mother sent the money directly to Jackson Oil in March.  She sent another $200,000 directly to Jackson Oil in August.  The funds were never deposited in Bella-Genik's bank account.  Plaintiff had no documents regarding the shareholder loan to Bella-Genik.  Plaintiff provided his mother's bank statements showing a withdrawal of $200,000 on March 6 and another withdrawal of $200,000 on August 21.  (Ptf's Ex 19 at 3, 7.)

Plaintiff testified that, at the urging of his sisters, he and his mother met with an attorney to document the loan.  He and his mother signed an "Acknowledgement of Monies Received" on December 13, 2012.  (Ptf's Ex 18 at 1.)  It stated that Plaintiff's mother wired two payments of $199,951.40 to Jackson Oil Company on behalf of Plaintiff on or about March 30, 2012, and August 30, 2012.[2]  (*Id.*)  It further stated the payments were for a "business debt" for which Plaintiff was "personally indebted."  (*Id.*)  Plaintiff testified that he and his mother did not agree

---

[1] Unless otherwise stated, the facts presented pertain to 2012.

[2] Plaintiff explained the discrepancy between $200,000 and $199,951.40, testifying that there was a $40 to $50 fee associated with the wire transfer and the rest went to Jackson Oil.

to an interest rate; his mother did not want interest and Plaintiff was told there was a default interest rule under the law. Plaintiff's mother passed away in 2016 and he currently pays his sisters $1,000 per month on the loan.

Plaintiff testified that he asked his bookkeeper to report the loan transactions in his books. He identified four general journal entries in Jack's books labeled "Payable-Shareholder" as reflecting his mother's payments to Jackson Oil. (*See* Def's Ex N.) Each entry was listed under the category for gas or diesel. (*See id.*) Those entries are $92,308.40 on March 30 (line 13878); $92,308.40 on August 30 (line 14067); $107,643 on March 30 (line 14093); and $107,643 on August 30 (line 14134). (*See id.*) The entries do not reference a wire or transfer fee or identify where the money went.

Plaintiff testified that Jackson Oil was unwilling to provide account statements showing his payments because he still owes $60,000 and is trying to negotiate a deal to pay the remaining balance and continue purchasing fuel.

B.   *Defendant's Adjustments*

Warren testified that she audited the books of all three gas stations and adjusted each, though the largest adjustments were to Jack's. She adjusted Jack's shareholder payables by approximately $400,000 after she asked for documents to support the four general journal entries but did not receive them. (*See* Def's Ex J at tab 35 (adjustments highlighted); *see also* Def's Ex F at 10 (request that Plaintiff provide "[d]ocuments regarding transactions with Jackson Oil Company showing payments made and purpose of payments" to which Plaintiff responded that he was unable to locate responsive documents).) Warren testified that she questioned the four large entries because they were lump sums with no explanation. She was not convinced that Plaintiff received a bona fide loan and she was unable to trace the movement of the money.

Warren described a second basis for her adjustments; namely, that the general journal entries reflect double-counting of costs. Plaintiff wrote off a substantial amount of diesel and gas costs from Jackson Oil bills. (*See* Def's Ex N at lines 13764 through 14069 (diesel) and 14073 through 14133 (gas).) The books reflect bills, mostly ranging from $10,000 to $20,000, accruing several times each month including March and August.[3] (*See id.*) Plaintiff confirmed that he claimed all the Jackson Oil bills[4] as cost of goods sold (COGS). He provided no evidence showing that the four general journal entry payments represented additional bills.

C.     *Plaintiff's Profit Margins*

Plaintiff maintains that Defendant's adjustments to Jack's books yield unreasonable profit margins as compared with industry standards and inconsistent with Plaintiff's disposition of Jack's and Jerry's in August 2012. Plaintiff testified that his gross profit on a gallon of diesel was approximately 6 or 7 percent. He testified that gross profits on gasoline typically range from 8 to 17 percent, industry-wide. Jack's books originally showed a loss on diesel and a 7.5 percent profit on gas. (*See* Def's Ex N (total diesel sales of $1,058,719 (line 10996) and total diesel costs of $1,124,195 (line 14069); total gas sales of $866,991 (line 11987) and total gas costs of $801,998 (line 14135).) Plaintiff testified that, based on Defendant's adjustments,[5] Jack's realized a 30 percent profit margin on diesel and a 32 percent profit margin on gas, neither of which is reasonable in the industry.

---

[3] The books reflect the following numbers of bills each month: four in January; six in February; four in March; six in April; seven in May; one in June; eight in July; and three in August. (Def's Ex N at lines 14073 through 140133.) Warren noted that Jerry's books also reflected bills from Jackson Oil consistently accruing during the relevant time periods, though there were no bills in August; the last one was July 25. (*See also* Def's Ex O at lines 8568 through 8848 (diesel) and 8849 through 8900 (gas).)

[4] Warren testified that, because Plaintiff reports on the accrual basis, expenses are incurred when billed, so deducting again when paid is a double deduction.

[5] *See* Def's Ex B at 3-4 (explaining adjustments).

For comparison, Plaintiff offered evidence of the profit margins realized by Q Pioneer and Jerry's. The parties stipulated that Q Pioneer's diesel profit margin was approximately 4 percent before Defendant's adjustments and 4.5 percent after. They stipulated that its gas profit margin was 14 percent. The parties stipulated that Jerry's diesel profit margin was 3.5 percent before Defendant's adjustments and 6.3 percent after.

Plaintiff testified that Jack's would purchase four or five loads of fuel in 10 days; each load was 10,000 gallons and approximately $3.70 per gallon, or $37,000 per load. He testified that his bookkeepers tracked payments and loads with Jackson Oil. Plaintiff testified that he kept Bella-Genik afloat using funds from Q Pioneer but, by August 2012, he ran out of funds and gave Bella-Genik's assets (Jack's and Jerry's) back to a creditor. Warren acknowledged that Bella-Genik's reported income in 2013 was consistent with winding down a business.

Warren testified that she does not know industry standard profit margins for gas stations. She could not explain the discrepancy between Jack's profit margins (after adjustments) and those of Jerry's and Q Pioneer, other than the possibility that some entries were crossed between Jack's and Jerry's books. Warren testified that Plaintiff's "gross profit method" is an "indirect method" which is less reliable than a "direct method" of reviewing books and documents. She testified that Jack's reported diesel income and costs resulted in a negative profit margin, which she would not expect to see. (*See also* Def's Ex Q at 3.)

## II. ANALYSIS

The sole issue presented is whether Plaintiff should be allowed an additional $399,902.80 in COGS associated with Bella-Genik, resulting in reduced gross income for the 2012 tax year.

The legislature intended to "[m]ake the Oregon personal income tax law identical in effect to the provisions of the Internal Revenue Code [IRC] relating to the measurement of

taxable income of individuals * * *." ORS 316.007(1).[6]  Under Oregon law, taxable income is as defined in IRC section 63(a) or (b), with additions, subtractions, and adjustments prescribed by Oregon law.  ORS 316.022(6).  Under IRC section 63(a), taxable income is "gross income minus the deductions allowed by this chapter (other than the standard deduction)."  "Gross income" is "all income from whatever source derived[.]"  IRC § 61(a).  COGS is not a business expense deduction under IRC section 162, but rather is subtracted from gross receipts to determine gross income.  *See Max Sobel Wholesale Liquors v. Comm'r*, 69 TC 477 (1977), *aff'd* 630 F2d 670 (9th Cir 1980); Treas Reg §§ 1.61-3(a), 1.162-1(a).

Deductions are "a matter of legislative grace" and taxpayers bear the burden of proving their entitlement to the deductions claimed.  *INDOPCO, Inc. v. Comm'r*, 503 US 79, 84, 112 S Ct 1039, 117 L Ed 2d 226 (1992).[7]  "In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof.  The burden of proof shall fall upon the party seeking affirmative relief[.]" ORS 305.427.  "Preponderance of the evidence means the greater weight of evidence, the more convincing evidence."  *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971).  "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990).  "In an appeal to the Oregon Tax Court from an assessment made under ORS 305.265, the tax court has jurisdiction to determine the correct amount of deficiency, even if the amount so determined is greater or less than the amount of the assessment determined by the Department of Revenue, and even if determined upon grounds other or different from those asserted by the department * * *." ORS 305.575.

---

[6] The court's references to the Oregon Revised Statutes (ORS) are to 2011.

[7] *See Pridgen v. IRS*, 2 Fed Appx 264, 273 (4th Cir 2001) (applying the same burden of proof to COGS as to deductible expenses because "deductions are a matter of statutory privilege").

A.      *Business Loan to Pay Jackson Oil Debt*

Plaintiff's primary argument is that the four journal entries totaling approximately $400,000 reflected a loan from his mother, paid directly to Jackson Oil.  (*See* Ptf's Post-Tr Br at 1.)  The court gives some weight to Plaintiff's evidence, consisting of his sworn testimony, the statement signed by his mother, and his mother's bank statements showing withdrawals.  No evidence was presented to contradict Plaintiff's explanation of the loan, although Defendant aptly pointed out the missing evidence one would expect associated with a business debt, such as demand letters, billing statements, invoices, or the credit agreement with Jackson Oil.  (Def's Post-Tr Br at 2.)  Even if the court accepts that Plaintiff's mother gave him a business loan in 2012, he failed to present evidence that his mother's loan was used to pay for Jackson Oil bills *other than* those already reflected in Plaintiff's books and deducted as COGS.

Bella-Genik used the accrual method of accounting.  Under the accrual method, "a liability is incurred and taken into account in the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy."  *Golden Gate Litho v. Comm'r*, 75 TCM (CCH) 2312, 1998 WL 234411 at *8 (1998) (citing Treas Reg § 1.461-1(a)(2)).  An expense is deducted "even though the liability is not due and payable until a later year."  *Id.* (citations omitted).  Bella-Genik's books reveal bills from Jackson Oil accruing regularly throughout 2012, including in March and August.  Plaintiff identified no gaps in Bella-Genik's books and provided no evidence of bills received that were not entered into Bella-Genik's books.  The court concludes that any business loan received from Plaintiff's mother was used to pay existing debts previously deducted by Plaintiff under the accrual method.  To allow additional COGS of $400,000 would permit Plaintiff a double deduction.

B.      *Reasonable Profit Margins*

Plaintiff's second argument is that Defendant's adjustments to Jack's books result in unreasonable profit margins on sales of diesel and gas, particularly for a struggling business. (*See* Ptf's Post-Tr Br at 2-4.)  Plaintiff testified that diesel profits typically ranged from 6 to 7 percent and gas profits ranged from 8 to 17 percent.  After Defendant's adjustments, Plaintiff's other two gas stations yielded diesel profits of 4.5 and 6.3 percent, and gas profits of 14 percent. By contrast, Jack's profits after adjustments were 30 percent on diesel and 32 percent on gas. Plaintiff argues that, following the rule in *Cohan v. Comm'r*, 39 F2d 540 (2d Cir 1930), the court should estimate Jack's COGS based on a reasonable profit margin for diesel and gas.  Defendant disagrees that the *Cohan* rule is applicable here because Plaintiff failed to present independent, expert evidence of industry profit margins and because Defendant already allowed Bella-Genik substantial COGS for diesel and gas: over $2.8 million as compared with over $3.4 million claimed.  (Def's Post-Tr Br at 6, 12-14.)

In *Cohan*, the court found that the taxpayer had incurred "substantial sums" associated with travel and entertainment, yet he "kept no account."  39 F2d at 543.  The board of tax appeals refused to allow a deduction for any expenses because "it was impossible to tell how much he had in fact spent, in the absence of any items or details."  *Id.*  The court reversed:

> "Absolute certainty in such matters is usually impossible and is not necessary; the Board should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making.  But to allow nothing at all appears to us inconsistent with saying that something was spent."

*Id.* at 543-44.  Where the taxpayer was allowed some amount of COGS, the court may decline to allow additional COGS under *Cohan*, particularly where taxpayer fails to present persuasive evidence to show that he is entitled to a greater allowance.  *Pridgen*, 2 Fed Appx at 275 (citations omitted).

As discussed above, Plaintiff failed to present persuasive evidence of additional amounts

billed for diesel and gas in 2012 beyond what is clearly identified in Bella-Genik's books.

Unlike in *Cohan*, Defendant here allowed Plaintiff a significant amount of the diesel and gas

COGS claimed by Bella-Genik. Even if the court were inclined to estimate a COGS total greater

than what Defendant allowed, Plaintiff has not supplied the court with persuasive evidence from

which to make an estimate. Plaintiff failed to provide independent or expert testimony on typical

profit margins in the gas station industry. *See Pridgen*, 2 Fed Appx at 274 n5 (noting that

"assessment of profit margin averages in the tobacco industry is 'specialized knowledge' for

which expert testimony is required"); *see also Olive v. Comm'r*, 139 TC 19 (2012) (estimating

the taxpayer's COGS based on expert testimony on industry standards rather than upholding the

commissioner's disallowance of virtually all COGS).

### III.  CONCLUSION

After careful consideration, the court concludes that Plaintiff has failed to prove by a

preponderance of the evidence that Bella-Genik's gross income should be reduced based on

additional COGS of $399,902.80 for the 2012 tax year. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ____ day of June 2019.

ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed.  TCR-MD 19 B.*

*This document was signed by Magistrate Allison R. Boomer and entered on June 21, 2019.*